## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HOFFMAN INTERNATIONAL, INC,

     Plaintiff,

       v.

TEREX USA, LLC,

     Defendant.

Case No:

## COMPLAINT

Plaintiff, Hoffman International, Inc. for its Complaint against Terex USA, LLC ("Terex") alleges as follows:

## NATURE OF THE ACTION

1.    This matter arises out of a Distributor Agreement executed by Hoffman and Terex on or about October 17, 2018.  Defendant Terex is a manufacturer of heavy equipment that was in need of a distributor for its territory in the State of New Jersey, and in certain Counties in the States of New York and Pennsylvania.  Terex had its distributor for this territory and, as result, approached and pursued Hoffman to serve as its new distributor.

2.    Hoffman has been a distributor for manufacturers of heavy construction equipment for many years dating back to the late 1970's and has developed an excellent reputation in in the sales, leasing and servicing of heavy construction equipment in the Tri-State area.

3.    Hoffman, to its detriment, was lured into a distributor relationship with Terex, based upon certain promises and representations that have proven to be false.

4.      Hoffman now seeks money damages and other relief related to the misrepresentations of Terex, as well as its failure to live up to and abide by the terms of a Distributor Agreement executed by the parties.

## THE PARTIES

5.      Plaintiff, Hoffman International Inc., is a New Jersey Corporation which has its headquarters at 300 South Randolphville Road, Piscataway, New Jersey 08854.

**6.**      Defendant Terex USA, LLC, is, upon information and belief, a Delaware Limited Liability Company, which has its principal place of business in Westport, Connecticut.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to forum selection clause in the Distributor Agreement between Hoffman and Terex dated October 17, 2018.

8.      In paragraph 9.2 of the Agreement, the parties agreed that:

any dispute arising out of or in relation to this Agreement shall be exclusively decided by the United States District Court, Southern District of New York.  The parties consent to the exclusive jurisdiction of the United States District Court, Southern District of New York or, if Federal jurisdiction is lacking in such legal action, in the Supreme Court of Suffolk County, New York, U.S.A. and waive any and all objections to the jurisdiction of venue of said Court.

9.      The amount involved in this action, exclusive of interest, cost and attorneys' fees exceeds $75,000.

10.      The parties to this action are citizens of different States.  Accordingly, pursuant to 28 U.S.C. §1332, this Court has also jurisdiction over the parties hereto and over subject matter of the action.

## FACTS

11.      Plaintiff repeats and realleges the allegations set forth in the proceeding paragraphs as though more fully set forth herein.

12.     As noted above, the parties entered into a Distributorship Agreement ("Agreement"), on or about October 17, 2018, a copy of which is attached hereto as **Exhibit 1**.

13.     Under the terms of the Agreement, Hoffman agreed to serve as a Distributor of Terex products in a geographic Territory defined as follows:

> The State of New Jersey, New York Counties of Sullivan, Ulster, Dutchess, Orange, Putnam, Westchester, Rockland, Bronx, New York, Richmond and King and Pennsylvania Counties East of and including Tioga, Clinton, Centre, Blair and Bedford.

14.     Under the terms of the Agreement, Hoffman was bound to use its best efforts to develop fully the potential for sales of Terex products and support services in the Territory.

15.     In agreeing to serve as the Distributor for Terex, Hoffman made a significant commitment of money and manpower.

16.     Hoffman was obligated to promote Terex products under its Fuchs scrap handler product lines, as well as support services within the Territory. Terex also demanded that Hoffman commit to purchase certain minimum amounts of equipment and parts each year.

17.     Under the terms of the Agreement (see **Exhibit 1**), Hoffman had to spend a minimum of $10,000 per year on advertising and was required in 2019 to purchase six (6) Material Handlers from Terex.  That number increased to seven (7) in 2020.

18.     In addition, Hoffman was required to purchase parts from Terex in a sum equivalent to 10% (although other Terex communications fix this at 5%) of the total value of the equipment purchases each year.

19.     In so doing, Hoffman took on a significant financial obligation.

20.     Hoffman also agreed to use its existing branches located in Piscataway, New Jersey, Medford, New York, Williamstown, New Jersey, Bronx, New York and Marlboro, New York to provide services and sell the equipment in accordance with the terms of the Agreement.

21.     Hoffman took on this substantial obligation in reliance upon certain representations and promises from Terex.

22.     Hoffman relied upon the Terex pledge that it would provide a Limited Product Warranty ("the Warranty"), as described on Exhibit F to the Agreement, under which Terex would reimburse Hoffman for apparent service work which fell under the terms of the Warranty.

23.     Prior to executing the Agreement, Hoffman had expressed its concern and unwillingness to execute the Agreement, because of the existence of a dedicated Terex dealer, Company Wrench, located at 2636 S. Black Horse Pike, Williamstown, New Jersey, within the Territory being granted to Hoffman.

24.     Hoffman was particularly concerned about Company Wrench, because their location was adjacent to Hoffman's dealership located at the time at 2610 S. Black Horse Pike, Williamstown, New Jersey.

25.     Hoffman received and relied upon assurances from Terex representatives, including Mr. Anthony Laslavic, Regional Distributor Relationship Manager, Mr. Tim Gerbus, National Director of Sales and Distribution, and Mr. Todd Goss, General Manager, that this dealer would not be allowed to continue to operate and sell products within the Territory once Hoffman was appointed as the dedicated Distributor.

26.     Hoffman was willing to accept a non-exclusive distributor arrangement if the non-exclusivity applied to sales by Terex as the Supplier under the Agreement.  Hoffman would not agree to having competing dealers selling and servicing equipment in the Territory, given the commitment and investment that Terex required from Hoffman as a Distributor.

27.     In this regard, in exchanging drafts of the Agreement, Mr. Timothy Watters, Hoffman's President, deleted language allowing Terex to appoint other distributors in the

Territory.  In an email on October 24, 2018, Todd Goss, General Manager for Terex, accepted Hoffman's deletion of this provision.

28.     However, on or about January 30, 2020, on a visit to Hoffman facility located immediately adjacent to Company Wrench's dealership in Williamstown, New Jersey, Mr. Watters discovered that Company Wrench was marketing for sale a brand new 350 Model Scrap Handler right next door.  Mr. Watters advised Jim Gill, a sales representative that Terex had insisted Hoffman hire as part of the Distributorship, that "This was NOT supposed to happen according to our discussions with Fuchs when we signed up."

29.     Mr. Gill notified Fuchs by email on January 31, 2020 of this new unit in New Jersey being sold by Company Wrench, but also that Company Wrench was selling to existing Terex customers in Hoffman's Territory.  He pointed out that the Agreement only allowed Terex to sell into the Territory, not another dealer.

30.     In another email on January 31, 2019 to Mr. Anthony Laslavic from Fuchs North American, Mr. Watters said "could you please get that 350 in Williamstown out of my territory!!", referring to a Scrap Handler being marketed by Company Wrench.

31.     In an email response on the same day, Mr. Laslavic assured Mr. Watters that "we intend to make that happen".

32.     On February 1, 2020, Mr. Timothy Gerbus of Fuchs sent an email to Jim Gill of Hoffman assuring him that Fuchs "takes this type of dealer behavior very seriously.  We are working on some solutions and should have some answer that can be discussed at AED if you have any questions before hand please give me a call."  (AED is a gathering of equipment dealers in Washington, which was to take place from June 11 to June 13, 2019 in Washington, D.C.).

33.     Meanwhile, while equipment purchased by Hoffman as required by its Agreement sits in the Hoffman yard waiting to be sold, Company Wrench is actively selling comparable Terex machines to Terex customers and doing so without having to take on the considerable financial investment agreed to by Hoffman in its Agreement with Terex.

34.     Upon information and belief, Terex allowed Company Wrench to sell to customers inside Hoffman's Territory, including Guida Scrap Metal in Keyport, New Jersey, Curlo Scrap Metal in Saddle Brook, New Jersey, Allegheny Iron & Metal in Philadelphia, Pennsylvania and Giordano Recycling in Vineland, New Jersey.

35.     In addition, after executing the Agreement, Hoffman learned that another dealer, All Island Equipment located at 36 Jersey Street, West Babylon, New York, was also selling Terex equipment within the territory assigned to Hoffman.

36.     Terex failed to disclose the existence of this competing dealer prior to execution of the Agreement.

37.     Terex also failed to disclose other ongoing matters, which were having a substantial impact on Terex customers and the Fuchs brand within the Territory.

38.     Upon information and belief, certain scrap handlers were experiencing recurring engine problems, resulting in significant, unexpected downtime for customers who purchased these machines.

39.     More disturbing, and upon further information and belief, the MHL360 and MHL370 model Scrap Handlers sold by Terex had started to suffer catastrophic failures of the boom.  This was a serious mechanical problem and significant safety issue.

40.     One customer, Sims Metal Management, located at One Linden Avenue, Jersey City, New Jersey, owned approximately six or seven MHL370 Scrap Handlers, which they had purchased prior to Hoffman becoming the Distributor for this Territory.

41.     After Hoffman took over as the Distributor for the Territory, Sims advised Hoffman that they would never buy another Scrap Handler from Fuchs due to the serious engine problems they were having with their Fuchs machines.

42.     When Hoffman communicated this news to Terex representatives, they insisted that Hoffman try to salvage this relationship.

43.     Hoffman did what Terex requested, dedicating personnel and resources in an effort to win back Sims as a Fuchs customer.

44.     Hoffman also agreed to become a Deutz dealer.  Deutz was the manufacturer of the engines used in many of the Terex Scrap Handlers.  These engines were experiencing failures and significant downtime.  Hoffman took on this new distributorship as a measure to support Terex and provide an added level of support to customers. This new dealership required more investment by Hoffman and the hiring of more personnel.

45.     In the midst of these efforts, one of the Sims' Scrap Handler machines suffered a catastrophic failure of the boom on the machine.

46.     Repairing a boom is a large job, and Hoffman spent considerable disassembling the boom and transporting it to Hoffman's yard for repairs.  Hoffman spent approximately $75,000 to repair the Scrap Handler machine.

47.     When presented with this invoice for Hoffman's services, Terex offered to pay only a small portion of Hoffman's warranty claim.

48.     Not long thereafter, a second scrap handler machine owned by Sims suffered a catastrophic failure of its boom.  At this point, Terex advised Hoffman that they expected all the booms to fail on the machines owned by Sims.

49.     This news surprised Hoffman.  Concerned with the safety risk associated with such catastrophic failures, Hoffman recommended to Terex that they take action proactively to perform preventative work on the booms to avoid such dangerous failures.  Terex refused.

50.     In fact, Terex sent a Terex engineer purportedly to show Hoffman how these boom repairs could be done more swiftly and with less expense.  However, after making that effort, Terex was forced to acknowledge that Hoffman repaired the machines faster than the technicians sent by Terex.

51.     Eventually, every single boom on the Sims' Scrap Handlers failed.  Hoffman had to repair all these machines.  After Hoffman repaired the machines, Terex refused to pay the full value of Hoffman's warranty claims.

52.     Upon information and belief, these boom and engine problems were well known to Terex and had surfaced as a significant issue among Terex customers well before Hoffman executed the Agreement.

53.     As Terex was making its "pitch" to Hoffman, convincing Hoffman of the value of its brand, at no time did any representative of Terex mention the existence of these ongoing product issues.

54.     The problems with these Terex machines did damage to Hoffman's reputation beyond its role as a Terex Distributor, since Hoffman also sold and serviced other lines of heavy construction equipment to Sims and other Terex customers.

55. Terex exacerbated the damage done by its failure to disclose these product issues by saddling Hoffman with a Territory in which Terex was allowing other equipment dealers to sell Fuchs machines.

56. Terex assured Hoffman that it would not allow these dealers to sell into Hoffman's Territory, but subsequent events, as set forth herein, lead inevitably to the conclusion that Terex had no intention of shutting down the sales of Fuchs products by these competing dealers.

57. Thus, Terex had intentionally hid from Hoffman the fact that some of its most important products had a lengthy history of breakdowns and downtime, as well the potential for catastrophic failures of booms, which soured relationships with Terex customers.

58. With no notice of these issues, Hoffman executed the Agreement and thereafter made a substantial investment in its role as a Terex Distributor.

59. Hoffman hired a well-regarded manager to oversee the scrap operations, a scrap sales specialist and Terex technicians.

60. Hoffman purchased a robust supply of parts, tools and over $2.5 million in equipment inventory in accordance with the terms of the Agreement.

61. Rather than working with Hoffman to establish its presence and build its business in the scrap industry, which was starting to recover from a cyclical downturn, Terex chose another course of action.

62. After invoicing Hoffman for its initial purchase of equipment to build its Terex inventory, Terex took the legs out of Hoffman's efforts by reducing prices across the board on the models that had been purchased thereby rendering Hoffman's inventory unsaleable.

63.     Upon information and belief, Terex knew of the impending price reductions, hid this from Hoffman and charged Hoffman equipment prices that Terex knew would guarantee that each sale of the equipment purchased by Hoffman would produce a loss for Hoffman.

64.     Meanwhile, Terex customers within the Territory were angry over the problems plaguing the Fuchs products and were refusing to pay for repairs.

65.     Terex had a duty to disclose recurring product quality issues of this magnitude, especially when customers were refusing to pay invoices and Terex was refusing to honor warranty obligations.

66.     Terex knew well that this information would have impacted Hoffman's decision whether to become a Terex distributor.

67.     Thus, rather than disclose these issues and risk losing Hoffman as a Distributor, Terex stayed mum.

68.     Remarkably, despite these problems and difficulties with Terex, Hoffman did the best it could under the circumstances to deal with these problems.

69.     Hoffman did all it could to salvage the brand within its Territory.  Hoffman took on warranty work on machines, which had been sold by the prior Distributor.  Hoffman prioritized Terex warranty work over other more lucrative work, providing loaners and freight to customers whose machines were down and continuing to service important Terex customers who refused to pay old invoices.

70.     These customers were adamant that the continuing nature of the repair problems brought them within the terms of warranties, which Terex was refusing to honor.

71.     All the while, as Hoffman undertook Herculean efforts to resurrect this brand within the Territory, Terex did nothing to prohibit or restrict the ongoing sales efforts of a competing dealer in the Territory.

72.     As a result of the problems with the Terex equipment, Terex customers within the Territory have refused to pay certain invoices.

73.     From the time period commencing in November 2019 through March 2020, the total amount of unpaid work orders amounted to $363,685.12. A list of these unpaid invoices is attached hereto as **Exhibit 2**.

74.     During roughly the same time period, not only were customers refusing to pay invoices, but Terex was refusing to honor warranty claims. Attached as **Exhibit 3** is a copy of unpaid warranty claims in the amount of $176,182.58. To the present day, Terex refuses to honor these warranty claims.

75.     As noted above, Terex invoiced Hoffman for its first equipment order at prices well above the prices that Terex was about to set for these products. Attached hereto as **Exhibit 4** is a list of the five (5) Terex products purchased by Hoffman listing the original invoice and the discounted invoice amount offered by Terex shortly after invoices were issued to Hoffman. As can be seen, Terex discounted these products by roughly 8%, resulting in an excessive charge to Hoffman of $145,753.52.

76.     On or about May 31, 2020, Hoffman issued a Debit Note to Terex for the multiple expense items set forth above.

77.     Hoffman also initiated discussions with Terex and wrote to Terex in an effort to address these concerns.

78.     Terex has absolutely refused to reimburse Hoffman or set off these sums against other invoices issued to Hoffman.

79.     Hoffman has steadfastly honored its obligations under the Agreement, doing its best to make the Terex brand a success in the Territory.

80.     For its part, Terex failed to disclose material issues with its products and customers, misled Hoffman regarding its intentions to shut down sales efforts by an existing dealer in the Territory and overcharged Hoffman for its first equipment purchase.

81.     Terex has also consistently refused to work with Hoffman to address unpaid work orders from customers who are tired of recurring fares with the Terex equipment and has refused to pay legitimate warranty claims.

## COUNT I

### FRAUD

82.     The Plaintiff repeats and realleges the allegations set forth in the proceeding paragraphs as though more fully set forth herein.

83.     In enticing Hoffman to enter into the Agreement, Terex made certain false and misleading representations, or omitted material facts, that Hoffman relied upon to its detriment.

84.     Terex representatives assured Hoffman that an existing dealer would not be allowed to continue to operate within the Territory selling equipment in competition with Hoffman as the new dealer.

85.     Terex failed to disclose that All Island Equipment was selling Fuchs machines in the Territory offered to Hoffman.

86.     In getting Hoffman to agree to pay invoice prices for its first round of equipment purchases, totaling $1,683,994.48 worth of equipment, Terex failed to disclose that it was about to discount these prices, thus saddling Hoffman with equipment that was unsaleable.

87.     Terex also failed to disclose that there were substantial recurring product issues with some of the most important equipment models in its product line.  Specifically, the boom for Fuchs Scrap Handler machines had been experiencing problems across multiple customers, and the engines for these machines were also suffering problems resulting in significant downtime.

88.     The nature of these problems rises to the level of a product defect, which should have been disclosed to Hoffman prior to signing of the Agreement.

89.     Relatedly, Terex failed to disclose to Hoffman that the recurring equipment problems had created serious dissatisfaction among some of the most important customers in the Territory, leaving Hoffman to confront a situation where the customers it would rely upon for sales, were unwilling to pay for service work and were generally unwilling to continue to do business in the Terex market.

90.     Terex knew that if it had spoken truthfully to Hoffman about its plans for the existing Dealer in the Territory, the recurring problems with its equipment in the Territory, the refusal of its customers to pay for pending work orders and the general dissatisfaction of customers with the problems they were experiencing, Hoffman would have looked far less favorably upon taking on a Distributor role with Terex.

91.     Terex knew that Hoffman would rely upon the representations and the lack of disclosure in making its decision to become a Terex Distributor.

92.     Hoffman did, in fact, make its assessment relying upon Terex representations and did so without knowledge of substantial product issues and customer dissatisfaction.

93.     Hoffman also would never have agreed to a $1.6 million equipment purchase if it had known that Terex was poised to discount all of these prices, thus making its very first purchase of equipment under the terms of the Agreement one in which the products could never be profitable.

94.     Hoffman has suffered substantial financial damage as a result of the conduct of Terex and will continue to suffer losses as a result of misconduct.

## COUNT II

### BREACH OF CONTRACT
### (Implied Covenant of Good Faith)

95.     The Plaintiff repeats and realleges the allegations set forth in the proceeding paragraphs as thought more fully set forth herein.

96.     The Plaintiff repeats and realleges the allegations set forth in the proceeding paragraphs as though more fully set forth herein.

97.      As in all contracts, the Distributor Agreement imposed upon Terex a duty of good faith and fair dealing.

98.     Based on the foregoing actions and conduct of Terex, Terex has breached the implied covenant of good faith and fair dealing.  In so doing, Terex has deprived Hoffman of the anticipated fruits and benefits of the Distributor Agreement.

99.     As a result of that breach, Hoffman has suffered significant financial harm.

## COUNT III

### BREACH OF CONTRACT

100.     The Plaintiff repeats and realleges the allegations set forth in the proceeding paragraphs as though more fully set forth herein.

101.    Under the terms of the Agreement, Terex committed to pay for certain warranty work and agreed to issue its Warranty, as set forth in **Exhibit 5** to the Agreement, for products purchased by its customers through its Distributor.

102.    Certain Terex products have experienced significant failures and repair issues resulting in a substantial amount of service and repair work.

103.    Despite the widespread and recurring nature of these service and repair issues, Terex has refused to honor many of these warranty claims.

104.    Terex, in refusing to pay these warranty claims, has breached its commitment under the terms of the Agreement to pay for these warranty claims.

105.    As a result of this failure, Hoffman has been forced to make repairs and engage in work without payment.

106.    Hoffman has also experienced tremendous customer dissatisfaction and has been forced to prioritize Terex service over other service work for other manufacturers in an effort to protect its investment and salvage the Terex brand in this Territory.

107.    As of the date of the filing of this Complaint, there remains due and owing to Hoffman $176,182.58 in unpaid warranty claims.

<u>**COUNT IV**</u>

**BREACH OF WARRANTY**

108.    Plaintiff repeats and realleges the allegations set forth in the proceeding paragraphs as though more fully set forth herein.

109.    Under the terms of the Agreement, the Terex warranted that the new equipment would be free, under normal use and service, of any defects in material or workmanship for a period of 12 months from the date the equipment is first placed into service, whether such equipment is sold, rented or leased.

110.    Terex also warranted that its replacement parts would be free of defects in manufacturing materials.

111.    At the time that it entered into the Agreement, Hoffman was unaware that its predecessor Distributor had experienced significant repair issues with Terex equipment and a flood of warranty claims.

112.    The nature of these claims made clear that there were product defects occurring within the first 12 months of the shipment of new equipment from Terex.

113.    Despite Hoffman's best efforts to service and repair these issues, they continued to occur.

114.    Terex takes the position that the Warranty no longer covers the continuing nature of these problems.

115.    Hoffman asserts that Terex has an obligation under the Agreement to service the warranty issues that surfaced during the 12-month warranty-free period.

116.    Hoffman has been left to deal with the customers who refuse to pay work orders from Hoffman, because of the recurring nature of these problems.

117.    There remains due and owing to Hoffman from customers work order payments in the amount of $363,685.12.

118.    Terex has refused to honor or pay these work orders, refusing to acknowledge that its warranty covers any of this work.

119.    In so doing, Terex has breached its Agreement with Hoffman and caused Hoffman to suffer significant financial harm.

## COUNT V

### (Breach of Contract – Competing Dealer)

120.     Plaintiff repeats and realleges the allegations set forth in the proceeding paragraphs as though more fully set forth herein.

121.     Company Wrench and All Island Equipment continue to market and sell Terex equipment within the Territory.

122.     Despite assurances from Terex that this conduct would cease upon Hoffman accepting a Distributorship, it has not.

123.     Hoffman has protested the continuing sales efforts of these dealers within its Territory, and Terex has refused to take action to limit or stop this competition.

124.     While the Agreement describes the Territory as non-exclusive, this non-exclusivity applies to the ability of Terex, as the Supplier, to sell directly within the Territory to retail customers.

125.     Terex knows and understands that it does not grant a Territory to a Distributor, only to allow another competitor to engage in the sales activities within the Territory of the Distributor.

126.     No Distributor would agree to take on a Territory in which it was competing with another company for the products and brand that it agreed to represent and sell.

127.     Hoffman took on a substantial financial commitment to Terex, including the hiring of personnel, and agreeing to minimum equipment and parts orders on an annual basis.

128.     By allowing companies to continue to compete with Hoffman within its own Territory, Terex has breached the Agreement.

129.     As a result of that breach, Hoffman has suffered lost sales and other financial harm.

## COUNT VI

## VIOLATION OF NEW YORK FRANCHISE ACT

130.    Plaintiff repeats and realleges the allegations set forth in the proceeding paragraphs as though more fully set forth herein.

131.    NY Gen Bus L §687 makes it unlawful for a person, in connection with the offer, sale or purchase of any franchise to "employ any device, scheme or artifice to defraud."

132.    It is also unlawful to "make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

133.    Under the terms of NY Gen Bus L §691, a person who offers or sells a franchise in violation of NY Gen Bus L §687 is liable to the person purchasing the franchise for recission and interest at 6% per year from the date of purchase, along with reasonable attorneys' fees and Court costs.

134.    As set forth above, in enticing Hoffman to enter this franchise relationship, Defendant Terex willfully omitted certain facts from its discussions with Hoffman and under New York law it is unlawful for a person to make any untrue statement of a material fact or omit or state a material fact.

135.    Terex has violated §687 by failing to fully disclose numerous facts and circumstances as described above that materially impacted the nature of the franchise and its value. The Agreement executed by the parties provides that New York Law shall govern the relationship.

WHEREFORE, Plaintiff Hoffman International, Inc., demands judgment against Defendant Terex USA, LLC, as follows:

A.    An award of actual damage and lost profits as against Defendant Terex as a result of its unlawful misrepresentations, failure to disclose and breach of its Distributor Agreement with Hoffman, including an award for the gains, profits and advantages that Terex has obtained as a result of the lawful conduct alleged herein in an amount to be determined at trial;

B.    Damages and other relief provided for under New York's franchise Sales Act.

C.    An Order restraining Terex from selling equipment to, or providing inventory or parts to, Company Wrench and All Island Equipment.

D.    For an order awarding Hoffman all costs, litigation expenses and actual reasonable attorneys' fees pursuant to New York Law and the terms of the Agreement;

E.    For an award of compensatory damages against Terex USA, LLC.

F.    For an award of punitive damages against Terex USA, LLC.

G.    For an order that Hoffman recover its cost from Defendant Terex USA, LLC.

H.    For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Hoffman demands

a Trial by Jury of all issues so triable.


DATE: October __, 2020
New York, New York

**LAW OFFICES OF SHAWN J. WALLACH**

/s/*Shawn J. Wallach*_____
SHAWN J. WALLACH

52 Duane Street
Floor 7
New York, New York 10007
Telephone: (646) 868-5400.
E-mail: wallach.shawn@gmail.com

**BYRNES, O'HERN & HEUGLE, LLC**

/s/*Sean F. Byrnes*_____
SEAN F. BYRNES, ESQ. **

28 Leroy Place
Red Bank, New Jersey 07701
Telephone:  732-219-7711
Email: sbyrnes@byrnesohern.com

*Attorneys for Plaintiff Hoffman International, Inc.*


**\*\***Application for admission *pro hac vice* forthcoming

# EXHIBIT 1

## DISTRIBUTORSHIP AGREEMENT (USA Distributor)

This Distributorship Agreement is entered into on **October 17, 2018**, (the "Commencement Date") by and between Terex USA, LLC, having its principal office at 11001 Electron Drive, Louisville, KY 40299, Terex Global GMBH having its principle office at Bleicheplatz 2, 8200 Schaffhausen, Switzerland (collectively, Terex USA, LLC and Terex Global GMBH are referred to herein as "Terex" or "Company") , and **Hoffman International, Inc** (the "Distributor"), having its principal office at 300 S. Randolphville Rd., Piscataway, NJ 08854 registered in the State of **New Jersey**.

### W I T N E S S E T H :

In consideration of the mutual covenants contained herein, the parties agree as follows:

1. **Definitions.** As used herein, the term:

   1.1 **"Annual Business Plan"** shall have the meaning set forth in Section 3.5 of this Agreement.

   1.2 **"End User"** shall refer to a customer who purchases Products from Distributor, Supplier or another source for its own use and not for re-sale.

   1.3 "**Equipment**" shall refer to those goods manufactured and/or marketed by Supplier and listed on <u>Schedule A</u> attached, as such Schedule may be revised from time to time by Supplier, and all options, attachments and accessories to such goods.

   1.4 **"Minimum Marketing Expenditure"** shall mean the amount listed as the Minimum Marketing Expenditure in Schedule A attached hereto, or such other amount as evidenced from time to time in writing signed by Supplier and Distributor, which shall be used to advertise the Products.

   1.5 **"Minimum Purchases Amount"** shall mean the amount listed as the Minimum Purchases Amount in <u>Schedule A</u> attached hereto, or such other amount as evidenced periodically in writing signed by Supplier and Distributor, which shall be used to purchase Products from Supplier.  The Minimum Purchases Amount shall be measured using the aggregate net value of all Products and Parts purchased and paid for by Distributor during the applicable period. If Distributor and Supplier cannot agree on Minimum Purchase Amounts of Products to be purchased by Distributor during any Renewal Terms, then such minimum amounts shall be set by Supplier, acting reasonably in view of then-existing market conditions.

   1.6 "**Parts**" shall refer to those replacement, repair, spare or service parts for the Equipment and which are listed in Supplier's parts price list and any supplements furnished periodically to Distributor by Supplier.

   1.7 "**Products**" shall refer to the Equipment and Parts together.

   1.8 **"Product Line"** shall refer to the grouping of one or more Products more particularly specified on <u>Schedule A</u> as a Product Line.

   1.9 **"Product Support Services"** shall refer to after sale warranty and non-warranty service and support of Equipment by trained service technicians and the purchase, stocking, supply and sale of Parts to End Users regardless of whether the Equipment was initially purchased from Distributor. Distributor shall be required to send its technicians to Supplier provided or sponsored service training in advance of performing any services.

   1.10 **"Security Agreement"** shall mean any Security Agreement entered into between Distributor and Supplier on or about the date of this Agreement concerning Distributor's purchase of Products, substantially in the form of <u>Schedule D</u> attached hereto.

   1.11 **"Term"** shall mean the "Initial Fixed Term" and any "Fixed Renewal Term(s)." The initial term of this Agreement shall be a fixed term of **two (2) years and 75 days**(the **"Initial Fixed Term"**), commencing on the Commencement Date and ending on **December 31, 2020**, unless earlier terminated in accordance with this Agreement.  At the expiration of the Initial Fixed Term, this Agreement shall automatically renew for successive periods of twelve (12) months (each a **"Fixed Renewal Term"**) unless and until terminated in accordance with this Agreement.

   1.12 "**Terms and Conditions**" shall mean Supplier's Terms and Conditions of Sale, as revised periodically by Supplier, including without limitation those in effect on the date of this Agreement, as set forth in <u>Schedule E</u> attached hereto.

1.13 "**Territory**" shall mean the **geographical** territory of the **State of New Jersey, New York Counties of Sullivan, Ulster, Dutchess, Orange, Putnam, West Chester, Rockland, Bronx, New York, Richmond and King, and Pennsylvania Counties East of and including Tioga, Clinton, Centre, Blair, and Bedford. .**

1.13 "**Trademarks**" shall mean the marks or names specified as the Trademarks in **Schedule A** or such other marks or names as Supplier may from time to time specify shall be used by Distributor in relation to the Products.

2. **Appointment and Authority of Distributor.**

2.1 (a) Supplier appoints Distributor as a **non-exclusive distributor** of Supplier's **Products in the Territory during the Term**. Distributor accepts the non-exclusive appointment, and agrees that its appointment is on a non-exclusive basis and that Supplier is free to sell, rent, lease or otherwise convey Products within the Territory, including without limitation to those major account companies listed on **Schedule C** attached, as the same may be periodically amended by Supplier in its sole discretion, and irrespective of amendment of this Agreement by operation of law or otherwise, without incurring any liability or obligation to Distributor, whether for a commission or otherwise.

(b) Notwithstanding Section 2.1(a), if Distributor is in breach of its obligations under this Agreement, during any year of the Term, then Supplier, by giving written notice to Distributor which shall include a cure period of 120 days, will be entitled at Supplier's option with respect to the affected Products or a Product Line, to either: (i) terminate this Agreement with respect to the affected Products or particular Product Line(s); (ii) reduce the size and/or scope of the Territory with respect to any of the Products or particular Product Line(s) distributed hereunder; or (iii) terminate this Agreement in full.

2.2 Distributor may sell Products purchased from Supplier in such manner, at such prices and upon such terms as Distributor shall determine. Distributor is an independent contractor, not an agent or employee of Supplier. Distributor is prohibited from, and shall not enter into, any contract or commitment in the name or on behalf of Supplier or bind Supplier in any respect whatsoever. Distributor is not authorized to assume or create any obligation or responsibility, including but not limited to obligations based on warranties (other than as specifically provided in Section 7 hereof) or guarantees or other contractual obligations, on behalf or in the name of Supplier. Distributor shall not misrepresent its status or authority.

2.3 Supplier grants Distributor a revocable, royalty-free, non-transferable, limited license to use the Trademarks to promote the sale and servicing of the Products within the Territory, solely in accordance with the following terms: (a) Distributor may utilize the Trademarks in Distributor's marketing and identifying materials for the Products, and if requested, agrees to submit final proofs of all such identifying and promotional materials to Supplier for written approval prior to use; (b) Distributor shall not include all or any portion of the Trademarks in its legally registered corporate, company, domain or trade name; (c) Distributor agrees that it will utilize only materials which do not disparage or place in disrepute Supplier, its businesses, Products, or the Trademarks; (d) the license will cease immediately upon the earlier of: (i) the termination of this Agreement; or (ii) the continued failure of Distributor to use the Trademarks in accordance with the terms hereof after ten (10) days written notice of same; and (e) upon the termination of the license, all signs, advertisements, identifying materials, promotional materials, and other literature and/or media containing Supplier's trade name or Trademarks which are in Distributor's possession shall be immediately returned to Supplier or destroyed.

3. **Responsibilities of Distributor.**

3.1 Distributor agrees to use its best efforts to develop fully the potential for sales of Products and Product Support Services in the Territory. To fulfill this responsibility, Distributor shall, without limitation:

(a) Actively promote the sale and use of Products, and Product Support Services within the Territory to develop the market as fully as possible. Distributor will purchase all its requirements for Products and Product Support Services directly from Supplier. This shall include, without limitation, Distributor purchasing from Supplier Products in at least the Minimum Purchases Amount during each applicable period during the Term.

(b) Provide Supplier with quarterly sales forecasts for the Territory, which shall be reflected in the Minimum Purchases Amount.

(c) Maintain an inventory of Products reasonably sufficient to meet the anticipated short-term demand, and an organization and facilities (including, without limitation, suitable equipment and tools and Supplier trained Product service and support technicians) in accordance with standards generally accepted in the industry. **Schedule B** to this Agreement sets out a full and complete description of the location(s) of Distributor.

(d)   Employ experienced and adequately trained personnel in all functions, including competent salespeople, service technicians and parts representatives and maintain normal business hours customary in the industry at all facilities.

(e)   Deliver and perform satisfactory Product Support Services in a prompt, courteous and workmanlike manner with respect to all Products which are in the Territory, regardless of when, where or by whom sold. If Distributor is the End User of Equipment, and Distributor sells or otherwise transfers such Equipment during the term of the standard limited warranty, Distributor shall immediately notify Supplier of the purchaser or transferee of such Equipment.

(f) Maintain accurate records, financial statements and operating statements reflecting the condition of Distributor's business and provide such records to Supplier upon request, and allow Supplier's representatives, at reasonable times, to examine Distributor's place of business, inventories and business records to confirm Distributor's compliance with its obligations under this Agreement.  Distributor shall furnish Supplier within 45 days after the close of its fiscal year and at such other times and as of such dates as may be reasonably specified by Supplier, reports as to Products on hand (including the part number and amount), sales activity and statements showing the financial condition and operating status of Distributor.

(g)   Cooperate with Supplier in advertising, sales or promotion programs, and comply with such policies and procedures relating to advertising sales or promotion as Supplier may periodically adopt, and maintain a sufficient supply of current sales and service literature regarding the Products furnished by Supplier, and submit to a purchaser at or prior to delivery of Products all pertinent information furnished by Supplier for delivery with the Products, including any operator's or service manuals for the Products.

(h)   Notify Supplier immediately upon receiving notice of any claim, complaint or dispute being made against Distributor or Supplier by a customer or third party in respect of any of the Products.

(i)   Efficiently and promptly communicate all Terex campaign bulletins and product safety and service releases to all End Users who purchased Products from Distributor.

3.2 With each order for Products, Distributor represents that it has complied with all pertinent provisions of applicable international treaties, laws, rules, regulations, ordinances, standards and the like relating to, and will pay, all taxes, duties and other fees and charges imposed by any governmental authority applicable to, purchase,  resale or lease of the Products.  Distributor shall provide to Supplier copies of all exemptions, certificates and similar documents relating to any such taxes and other charges.  Distributor agrees to indemnify and hold Supplier harmless from all of the above-described taxes, duties, fees, and other charges.

3.3   Neither Distributor nor any person, organization or body interested in Distributor, whether as partner, shareholder, principal, director, officer or otherwise, will at any time during the Term of this Agreement be concerned or interested, in any capacity, and whether directly or indirectly, in the design, manufacture, production, importing, sale, hire or advertisement of any goods which are competitive with or similar to the Products, or which might in any way compete or interfere with the sale of the Products.

3.4 Commencing on the date which is fifteen (15) days from the Commencement Date, and thereafter annually during the continuance of this Agreement on a date to be fixed by Supplier by January 31 of each year (of which Distributor shall be notified in writing), Distributor shall submit to Supplier an "Annual Business Plan" for the following year's activities, which plan shall be subject to approval by Supplier. The Annual Business Plan shall contain a marketing report, a sales forecast and a proposed Minimum Purchase Amounts to be purchased by Distributor from Supplier during the following calendar year. The parties will meet quarterly, or at other agreed intervals, to review Distributor's progress in achieving the Annual Business Plan.  If Supplier, in its discretion, believes that Distributor may miss its annual Minimum Purchase Amounts and or any other performance targets, as set forth on **Schedule A**, Supplier may require Distributor to submit, within 45 days of the date of such meeting, a written action plan setting forth such business and marketing details that will result in Distributor achieving its Minimum Purchase Amounts and other annual performance targets as set forth in **Schedule A**.  If Distributor fails to provide such written action plan, then such failure shall be good cause for termination under this Agreement.

3.5 Distributor shall maintain at all times this Agreement is in effect, with a reputable insurer satisfactory to Supplier and in an amount satisfactory to Supplier, comprehensive fire, casualty and liability insurance protecting Distributor, the Products and the operations of Distributor under and pursuant to this Agreement, and protecting Supplier against any and all losses relating thereto by naming Supplier as a co-insured or additional insured on such policy(ies).  Distributor shall furnish certificates of such insurance to Supplier upon request.  Such insurance policy(ies) shall provide that the insurer will notify Supplier not less than thirty (30) business days in advance of any change in coverage or cancellation.

Product Liability

4.      **Sales Procedure and Terms.**

4.1 Prices to Distributor shall be those set forth in Supplier's price list, as periodically amended, less any applicable distributor discount published by Supplier from time to time. Payment for Products shall be on such terms as shall be established by Supplier from time to time.

4.2 All orders shall be subject to confirmation by Supplier and shall be subject to the Terms and Conditions, attached as <u>Schedule E</u>, which shall constitute, along with this Agreement and the Security Agreement, the entire agreement between the parties with respect to sales of Products; no additional or different terms set forth on Distributor's purchase order, acknowledgement or other forms shall govern any sales of Products by Supplier to Distributor, unless otherwise agreed to in writing by Supplier.

4.3 Supplier may refuse to accept any order if, in Supplier's opinion, Distributor's financial condition makes it imprudent to do so, or if Distributor has failed to perform its obligations under this Agreement.  In such cases Supplier shall have the right, but not the obligation, to ship Products to the end user and to bill the end user directly.  Supplier shall not be liable for failure to ship Products on time or fill orders for Products where prevented by any cause beyond Supplier's reasonable control, or if the demand for any Products shall exceed Supplier's available supply.  If Supplier does not have an adequate supply of Products for all orders from its distributors, Supplier may allocate Products among its distributors in any manner it deems appropriate.

4.4 Supplier may discontinue the manufacture of any Products and make any changes and improvements at any time in the specifications, construction or design of Products without incurring any obligation to Distributor.  Products so changed or improved will be accepted by Distributor in fulfillment of existing orders.

4.5 Distributor grants Supplier a security interest in all Products purchased or to be purchased by Distributor from Supplier hereunder as security for the payment in full by Distributor to Supplier of the full purchase price for such Products.  In furtherance, and not in limitation, thereof, Distributor agrees to enter into a Security Agreement with Supplier to further document the grant by Distributor of such security interest in favor of Supplier, and Distributor also agrees to authorize and execute  further documentation and filings that Supplier and Distributor have reviewed and agreed, including authorizing Supplier to file financing statements under the Uniform Commercial Code or other applicable law and which language has been reviewed and agreed by Distributor to perfect the security interests granted by Distributor in this Agreement and the Security Agreement.

5.      **Confidentiality.**  All plans, designs, drawings, blueprints, manuals, specifications and other documents relating to the business of Supplier ("Information") shall be and remain the exclusive property of Supplier and shall be treated by Distributor as confidential information and not disclosed, given, loaned, exhibited, sold or transferred to any third party without Supplier's prior written approval; provided, however, that these restrictions shall not apply to Information that Distributor can demonstrate: (a) at the time of disclosure, is generally known to the public other than as a result of a breach of this Agreement by Distributor; or (b) is already in Distributor's possession at the time of disclosure by from a third party having a right to impart such Information. In addition, Distributor may from time to time receive or possess personal data in connection with this Agreement.  Distributor represents and warrants that it shall comply with all applicable data protection laws and directives in connection with such personal data, and Distributor takes full responsibility for the personal data and any processing, transfer and use under such laws and directives.  Distributor further guarantees an adequate level of data protection in accordance with all applicable data protection laws and directives, and represents and warrants that (c) all affected third parties have been informed of, and have given their consent to such use, processing, and transfer as required by applicable data protection laws and directives, and that   (d) Distributor will take all appropriate technical and organizational measures against unauthorized or unlawful processing, transfer or use of the personal data.

6.      **Warranties, Limitations and Indemnification.**

6.1   For Products that qualify for warranty coverage under Supplier's warranty policy, Distributor agrees to extend Supplier's limited Product warranty in the form attached as <u>Schedule F</u> to its customers.  Distributor shall not extend to its customers on behalf of Supplier any other warranty with respect to Products.  In the event Distributor extends any additional warranty or any other obligation whatsoever, Distributor shall be solely responsible therefor and shall have no recourse against Supplier.  Distributor shall be responsible for any representations or statements that were not specifically authorized in writing by Supplier. **THE WARRANTY ATTACHED AS <u>SCHEDULE F</u> IS EXPRESSLY IN**

LIEU OF AND EXCLUDES ALL OTHER WARRANTIES, REPRESENTATIONS AND CONDITIONS, EXPRESS OR IMPLIED AND ALL OTHER STATUTORY, CONTRACTUAL, TORTIOUS AND COMMON LAW OBLIGATIONS OR LIABILITY ON SUPPLIER'S PART (INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PURPOSE) ARE HEREBY EXPRESSLY EXCLUDED TO THE MAXIMUM EXTENT PERMITTED BY LAW. THE WARRANTY ATTACHED AS SCHEDULE F IS SOLELY FOR DISTRIBUTOR'S CUSTOMERS AND SUPPLIER PROVIDES NO WARRANTY (OTHER THAN TITLE) TO DISTRIBUTOR WHATSOEVER; PROVIDED THAT, IN THE EVENT THAT THE DISTRIBUTOR PURCHASES A PRODUCT AND SUBSEQUENTLY OFFERS THE EQUIPMENT FOR RENTAL, THE DISTRIBUTOR SHALL BE DEEMED THE ORIGINAL PURCHASER AND/OR ORIGINAL END-USER FOR PURPOSES OF THE WARRANTY ATTACHED AS SCHEDULE F.

6.2. SUPPLIER SHALL NOT BE LIABLE FOR AND SPECIFICALLY DISCLAIMS ALL INDIRECT, CONSEQUENTIAL, INCIDENTAL OR OTHER DAMAGES OR LOSSES, WHETHER OR NOT ADVISED OF THE POSSIBILITY THEREOF.

6.3    Distributor and supplier shall indemnify and hold each other  and their  directors, officers, employees, agents, subsidiaries, parents and affiliates (each a "Protected Party") harmless from and against any and all claims, actions, suits, damages, losses, deficiencies, liabilities, obligations, commitments, costs or expenses of any kind or nature (including reasonable legal and other expenses incurred in investigating and defending against the same, and interest) incurred by such Protected Party resulting from (a) any breach of the representations, warranties, covenants, agreements and obligations of Distributor hereunder, or (b) any negligent or willful acts or omissions of Distributor or Supplier, their  directors, officers, employees, agents, contractors, subsidiaries, parents, affiliates or those acting under any of them, except to the extent caused by the gross negligence or willful misconduct of Protected Party.

7.    **Termination; Effect and Obligations Upon Termination or Expiration.**

7.1    This Agreement may be terminated, in whole or in part, by either party without cause upon not less than 120 days prior written notice to the other party.

7.2    Either party to this Agreement may terminate this Agreement immediately and without notice or further action of any kind if the other party becomes insolvent or the subject of any state or federal bankruptcy, insolvency or similar proceedings; makes an assignment for the benefit of creditors; becomes unable to pay its debts as they become due; goes into liquidation or winding-up; commences or has commenced with respect to it any dissolution proceedings; or if a receiver is appointed for a substantial part of the assets of such party; or if there is any levy, attachment or similar action that is not vacated or removed by payment or bonding within ten (10) days.

7.3   This Agreement may be terminated by Supplier at any time effective upon notice to Distributor in the event: (a) Distributor submits to Supplier any false or fraudulent statement, application, claim or financial information, or other information relating to Distributor's sales of the Products or warranty service related to Products; (b) Distributor or any of its officers, directors, employees or agents, makes or shall have made, in connection with its application to be a Distributor, any material misrepresentation or omission; (c) Distributor, or the proprietor or general manager of Distributor, or any of its officers or directors, is convicted of any violation of law if, in Supplier's opinion, such conviction would adversely affect the business or reputation of Supplier, the Products, or other authorized distributors of Supplier; (d) Distributor fails to continue to operate its business as customarily operated or Distributor abandons its business, or there is any change, whether direct or indirect, voluntary or involuntary, in the ownership or control of Distributor; or (e) Distributor violates any provision of Sections 3 or 8.

7.4    This Agreement may be terminated by Supplier upon thirty (30) days prior written notice to Distributor, in the event: (a) Distributor fails to pay any amounts owing to Supplier when due under this Agreement, or Distributor otherwise breaches or fails to perform its obligations under this Agreement or any other agreement between the parties, and such failure is not cured within the 120 day notice period provided; (b) any licenses, permits or authorizations necessary to conduct Distributor's business in accordance with the terms hereof are not obtained or maintained, or are cancelled, revoked or suspended; or (c) there is any transfer or attempted transfer by Distributor of all or any part of its rights under this Agreement, without Supplier's prior written consent.

7.5    Any act or omission of any affiliate of Distributor, which if committed or omitted by Distributor would have been a breach of this Agreement by Distributor, will be deemed to be a breach of this Agreement by Distributor, and Distributor will be liable to Supplier accordingly.

7.6    In the event of expiration or termination of this Agreement for whatever reason:  (a) All indebtedness of Distributor to Supplier shall become immediately due and payable;  (b) Distributor will immediately cease to use any documents identifying it as a distributor or dealer for Supplier, and will promptly remove all signs, cancel all business listings, and take such reasonable actions as may be necessary to remove its identification as a distributor of the Products of Supplier;  and (c) Distributor shall immediately cease all use of Supplier's trademarks and trade names.

7.7  Upon the effective date of any expiration or termination of this Agreement:  (a) Distributor will return, at its cost and expense, all records, books, customer, prospect or price lists, drawings, blueprints, instruction sheets, service parts, cross-reference materials, machine records, sales and service records, advertising and promotional materials and all of Supplier's supplies of every kind and character, and all other documents relating to the business of Supplier which may be in the possession or under the control of Distributor; and (b) Unless Supplier repurchases any Products pursuant to Section 7.8, Distributor will give to a successor distributor, if one has been designated by Supplier, the first option to purchase Distributor's stock of Products or any portion thereof, at the lesser of prices at which similar products are currently offered to distributors by Supplier or the price paid (or to be paid) by Distributor to Supplier for the Products (net of freight, packaging, handling, insurance, taxes and like charges).  Nothing contained in this Agreement shall be construed to obligate Supplier or any successor distributor to purchase any or all of Distributor's stock of Products.

7.8  After expiration or termination of this Agreement, Supplier shall have the option in its sole discretion to repurchase part or all of the Products sold to Distributor by Supplier, If Supplier elects to repurchase such Products, Distributor will execute and deliver to Supplier all documents reasonably requested by Supplier to transfer title to Supplier and to establish that such Products are being transferred free and clear of all such liens, claims and encumbrances and in accordance with all applicable laws.  The repurchase price of Products shall be the lesser of the price paid (or to be paid) to Supplier by Distributor for such Products (net of freight, packaging, handling, insurance, taxes and like charges), and the then-current price of the Product charged by Supplier to its other distributors.

**8. Anti-Corruption; Export Controls; No Boycotts.**  Distributor agrees that it shall, and that any party retained or paid by the Distributor ("Retained Party") shall, comply with all applicable laws including, but not limited to, laws prohibiting public corruption or commercial bribery.  Distributor shall not, in connection with any business involving Supplier, make or promise to make any payment or transfer anything of value, directly or indirectly: (i) to any officer or employee of any government department or agency, any political party, any political party official or candidate for any such government or political party office, as well as any immediate family member or nominee of such official or candidate (a "Government Official"); (ii) to any person, while knowing or having reason to know that such payment or item of value will be offered or given to a Government Official; (iii) to any officer, director, employee, or representative of any actual or potential customer of Supplier; or (iv) to any officer, director or employee of Supplier or any of its affiliates (or to an intermediary for payment to any of the foregoing).  It is the intent of the parties that no payments or transfers of value shall be made which have the purpose or effect of public or commercial bribery, acceptance of or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining or retaining business. This Clause shall not prohibit normal and customary business entertainment or the giving of business mementos of nominal value.  Distributor affirms that no Government Official has any direct or indirect ownership interest in, or is a director or employee of, Distributor.  Distributor agrees to notify Supplier immediately in the event that this changes during the term of this Agreement.  Distributor affirms that it will not utilize any third party in connection with the distribution of the Products without the written consent of Supplier, which consent shall be conditioned on Supplier receiving written assurance from such third party that it will comply with the provisions of this Clause. Distributor represents and warrants that it shall, and that any Retained Party shall, comply with all applicable export controls, economic sanctions, embargoes and regulations and any policies of Supplier, as amended from time to time ("Supplier Export Policy") regarding the export, re-export, shipment, distribution and/or sale of the Products, technology, information or warranty related services.  Distributor further agrees that it shall comply, and any Retained Party wherever located shall comply with applicable laws pursuant to the Joint Comprehensive Plan of Action (JCPOA) of July 14, 2015 and any other applicable laws, resolutions, regulations or licenses for the export or re-export of Products, technology, information or warranty related services directly, or with its knowledge indirectly into Iran. Distributor further agrees that it shall not, and any Retained Party shall not, export or re-export Products, technology, information or warranty related services directly, or with its knowledge, indirectly, into Sudan. Distributor further agrees that it shall not, and any Retained Party shall not, export or re-export Products, technology, information or warranty related services directly or with its knowledge indirectly into Cuba without Distributor first obtaining written approval from Supplier.  Within five business days of a written request by Supplier, Distributor shall provide Supplier with written certification in a form satisfactory to Supplier of compliance with this Clause.  If Supplier has information or belief that Distributor may have violated this Clause, Distributor agrees to cooperate with any investigation and grant Supplier the right to audit Distributor's books, records and other relevant documentation.  Distributor's failure to comply strictly with all applicable laws, regulations, licensing/approval requirements and Supplier Export Policy or to

cooperate with Supplier shall be grounds for immediate termination of this Agreement by Supplier. Notwithstanding anything to the contrary contained in any agreement between Distributor and Supplier or in any other document (including purchase terms and conditions) or instrument relating to the Products, Supplier will not comply with requests related to the boycott of any country or other jurisdiction, except to the extent such boycott is required by or otherwise not inconsistent with United States law.

9.      **Miscellaneous.**

9.1    This Agreement, together with the Terms and Conditions, and the schedules and attachments, constitutes the entire agreement between Distributor and Supplier, superseding all prior oral or written agreements, and may be amended only by a writing signed by both parties, unless otherwise specified in this Agreement. No failure of Supplier to insist upon strict compliance with any provision of this Agreement shall constitute waiver thereof for the future, and all provisions herein shall remain in full force and effect.

9.2   The parties agree that this Agreement shall be governed by and interpreted consistent with the laws of the state of New York, U.S.A.  The parties also agree that any dispute arising out of or in relation to this Agreement shall be exclusively decided by the United States District Court, Southern District of New York.  The parties consent to the exclusive jurisdiction of the United States District Court, Southern District of New York or, if federal jurisdiction is lacking in such legal action, in the Supreme Court of Suffolk County, New York, U.S.A. and waive any and all objections to the jurisdiction or venue of said Court.

9.3  If any portion of this Agreement shall be invalid or unenforceable or shall violate any applicable law, then such provisions shall be enforced to the maximum extent permitted by law, and such invalidity or unenforceability shall neither invalidate their effect elsewhere nor affect the validity or enforceability of the other provisions of this Agreement.

9.4    Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, by courier, sent by facsimile transmission (provided acknowledgment or receipt is delivered to the sender), sent by certified, registered mail or overnight mail.  Each such notice shall be sent to the address of the party set forth in this Agreement or such other address as shall have been specified by notice hereunder.

9.5    Distributor acknowledges that Supplier is relying on Distributor's skill and expertise to perform its obligations under this Agreement, and on certain representations from Distributor concerning the ownership of Distributor and the skill of its principals and key employees, and that this Agreement is in the nature of a personal services contract.  Therefore, this Agreement may not be assigned by Distributor, whether voluntarily or by operation of law, without the prior written consent of Supplier. This Agreement, or any of Supplier's rights hereunder, may be assigned by Supplier upon notice to Distributor.

9.6    Supplier shall have no liability for any expenditure made, or loss of income incurred, by Distributor in preparation for performance or in the performance of Distributor's obligations under this Agreement.  Neither Supplier nor Distributor shall by reason of the termination, expiration or non renewal of this Agreement be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, investments, leases, property improvements or commitments in connection with business or goodwill of Supplier, or Distributor, or otherwise.

9.7    While this Agreement is in effect or following its termination or expiration, Supplier may apply any amount which it or its divisions, subsidiaries or affiliates owes Distributor to any obligations of Distributor to Supplier or to any of its division, subsidiary or affiliate.

9.8    In the event Supplier sells Products to Distributor after termination or expiration of this Agreement, or accepts any order for Products from Distributor, such sales or acceptance shall not be construed as a renewal of this Agreement nor as a waiver of such termination or expiration unless Supplier shall have specifically so stated in writing, but shall in all other respects be deemed to be in accordance with the terms of this Agreement.

9.9 Neither party to this Agreement shall be liable to the other in any manner whatsoever for any failure or delay in performing its obligations under this Agreement due to force majeure, which for the purpose of this Agreement means any cause beyond the reasonable control of the party in question, including, but not limited to, governmental actions, war, riots, civil commotion, fire, flood, epidemic, labor disputes (including labor disputes involving the workforce or any part thereof of the party in question), restraints or delays affecting shipping or carriers, inability or delay in obtaining supplies of adequate or suitable materials or acts of God; provided that force majeure shall not affect the obligations of Distributor to make or procure payment to Supplier when due.

9.10 Distributor and Supplier acknowledge that the Products are not "Motor Vehicles", "Farm Equipment", "Utility Equipment" or "Industrial Equipment" and neither party regards them as such.  It is the parties' intent and agreement that the Motor Vehicles, Farm Equipment, Utility Equipment or Industrial Equipment dealer or franchise laws of any state, insofar as they might otherwise be deemed to apply to this Agreement and the relationship between Supplier and Distributor, shall not apply or be deemed applicable to this Agreement or the relationship created by this Agreement.

9.11 The terms of this Agreement that by either explicitly or implicitly are intended to survive, including but not limited to Sections 5, 6, 7 and 9, shall survive termination or expiration of this Agreement, in whole or part, for any reason whatsoever.

IN WITNESS WHEREOF, the parties have signed this Agreement in two originals, one for each party, on the dates written below, to be executed by their respective duly authorized officers as of the date first above written.

DISTRIBUTOR: **Hoffman International, Inc**

By:

Name: Timothy J. Watros

Title: President

Date: 10/31/18

SUPPLIER: **Terex USA, LLC**

By:

Name: Todd Goss

Title: G.M.

Date: 10/31/18

SUPPLIER: **Terex Global GmbH**

By: _____

Name:

Title:

Date:

**SCHEDULE A**

| Commencement Date : **October 17, 2018** |
|---|
| Initial Fixed Term: **Two (2)** year(s) **and 75 days**, commencing on the Commencement Date |

| Equipment:    **All material handlers manufactured by Terex-Fuchs** |
|---|

| Minimum Advertising Expenditure : **$10,000** |
|---|
| Distributor must submit to the Supplier a marketing plan by October 31 of each year for the following year's activities. |

<table>
<tr><th colspan="3">Equipment</th></tr>
<tr><th colspan="3">Minimum Purchases Amount</th></tr>
<tr><th></th><th>Year 1 2019</th><th>Year 2 2020</th></tr>
<tr><td>Manufacturer: **Terex Fuchs** Product Line: **Material Handlers**</td><td>**6 Units**</td><td>**7 Units**</td></tr>
</table>

If this Agreement is renewed or otherwise continued following the expiration of the Initial Fixed Term, then the total annual Minimum Purchases Amount of Equipment for Year 2021 and any subsequent year shall be agreed by the parties in writing at the end of Year 2020or any such subsequent year, as the case may be; provided however, that in no event shall the annual Minimum Purchases Amount of Equipment for Year 2021 and any subsequent year shall be less than the total annual Minimum Purchases Amount for the prior year.

If this Agreement is renewed or otherwise continued following the expiration of the Initial Fixed Term, then the total annual Minimum Purchases Amount of Parts for Year 2021 and any subsequent year shall be agreed by the parties in writing at the end of Year 2020 or any such subsequent year, as the case may be; provided however that in no event shall the annual Minimum Purchases Amount of Parts for Year 2021 and any subsequent year be less than the total annual Minimum Purchases Amount for the prior year.

<table>
<tr><th colspan="3">Parts</th></tr>
<tr><th colspan="3">Minimum Purchases Amount</th></tr>
<tr><th></th><th>Year 1 2019</th><th>Year 2 2020</th></tr>
<tr><td>Manufacturer: **Terex Fuchs** Product Line: **Material Handlers**</td><td>(10 )% of total Equipment purchases per year</td><td>(10 )% of total Equipment purchases per year</td></tr>
</table>

| Notice Period :  90 Days |
|---|

| Territory:  **State of New Jersey, New York Counties of Sullivan, Ulster, Dutchess, Orange, Putnam, West Chester, Rockland, Bronx, New York, Richmond and King, and Pennsylvania Counties East of and including Tioga, Clinton, Centre, Blair, and Bedford.** |
|---|

| Trade Marks : TEREX, FUCHS  and any and all related machine names, numbers and logos. |
|---|

| Minimum Staff: Persons required to be actively engaged in the management of the Distributor, names, titles and positions: _____ Owners and Managers of the Distributor required to be actively engaged in the management of the Distributor: **Tim Watters**_____ |
|---|

**SCHEDULE B:**
**STATEMENT OF DISTRIBUTOR LOCATIONS AND PREMISES**

For purposes of this Distributorship Agreement, Distributor and Supplier agree that the following describes the location(s) at which Distributor, as of the Commencement Date, is authorized to conduct Supplier distributorship operations. Distributor also represents that the terms under which it occupies the premises are accurately reflected below as follows:

A. LOCATION AND OWNERSHIP OF PREMISES

| Location | Street Address, City & State | Indicate by (X) Owned | Leased | Name of Lessor |
|---|---|---|---|---|
| Principal | Hoffman Equipment Co 300 S. Randolphville Rd Piscataway, NJ 08854 | | X | Hoffman Equipment Co |
| Branch 1 | 22 Peconic Ave Medford, NY 11763 | | X | Hoffman Equipment Co |
| Branch 2 | 2610 Black Horse Pike Williamstown, NJ 08094 | | X | Hoffman Equipment Co |
| Branch 3 | 1144 Zerega Ave Bronx, NY 10462 | | X | Hoffman Equipment Co |
| Branch 4 | 1440 Route 9W, Marlboro, NY 12542 | | X | Hoffman Equipment Co |

B. DESCRIPTION OF PREMISES LISTED IN "A" ABOVE AND PURPOSES FOR WHICH USED BY DISRIBUTOR

| Location | Purposes for which used - Indicate by (X) New Equip Sales | Used Equip Sales | Service Repair | Parts Sales | Land Acres | Bldg Sq. Ft. |
|---|---|---|---|---|---|---|
| Principal | X | x | X | X | 8 | 20,000 |
| Branch 1 | X | X | X | X | 2.5 | 7,000 |
| Branch 2 | X | X | X | X | 4 | 15,000 |
| Branch 3 | X | X | X | X | 1 | 10,000 |
| Branch 4 | X | X | X | X | 4 | 12,000 |

C. LEASED PREMISES: PROVIDE INFORMATION ON PREMISES DESIGNATED AS LEASED IN "A" ABOVE

| Location | Term of Lease From | To | Annual Rental | Term of Renewal Option |
|---|---|---|---|---|
| Principal | From | 2035 | $ | 5 YEARS |
| Branch 1 | | 2020 | $ | 5 YEARS |
| Branch 2 | | 2025 | $ | 5 YEARS |
| Branch 3 | | 2025 | $ | 5 YEARS |
| Branch 4 | | 2025 | $ | 5 YEARS |

**SCHEDULE C**

**Major Accounts**

**SCHEDULE D**

**Security Agreement**

In consideration of the sale of goods to **Hoffman International, Inc.** (the "Buyer") by **Terex USA, LLC and Terex Global GMBH** (the "Seller") and of the terms granted to Buyer by Seller in connection therewith, the parties hereto agree as follows:

1. **SELLER'S SECURITY INTERESTS; RIGHTS OF SELLER.** As security for the payment in full by Buyer to Seller of the full purchase price for the Purchase Money Collateral (as hereinafter defined) and any other obligations of Buyer to Seller related to the purchase price of said Purchase Money Collateral (the "PMSI Liabilities"), Buyer hereby grants to Seller a security interest in the following property, wherever located, whether now owned or hereafter acquired, and all cash proceeds of any of the following: all items of Buyer's inventory or other goods purchased from and financed by Seller (including, without limitation, all such goods held for sale, lease or demonstration or to be furnished under contracts of service, and goods leased to others, and returned or repossessed goods originally purchased from and financed by Seller) and all related software either embedded or not embedded and all spare and repair parts, special tools and equipment for the foregoing in each case purchased from and financed by Seller and as to which any portion of any financing related thereto remains unpaid (collectively, the "Purchase Money Collateral"). In addition to such foregoing security interest, and not in limitation thereof, as security for all of Buyer's debts, obligations and liabilities to Seller, however arising, whether previously, contemporaneously or hereafter made, incurred or created, and whether voluntary or involuntary (including without limitation any obligations arising under any Distribution Agreement and/or Selling Agreement between Buyer and Seller), Buyer hereby grants Seller a continuing security interest in all Purchase Money Collateral and all accounts, arising out of Buyer's disposition of said Purchase Money Collateral (collectively, the "Collateral"). At the request of Seller, Buyer agrees to enter into such agreements with Seller to further document the grant by Buyer of the above security interests in favor of Seller and to authorize and execute documents and filings reasonably acceptable to Buyer, that Seller deems necessary in connection therewith. Buyer hereby authorizes Seller to file financing statements under the Uniform Commercial Code to perfect and maintain the security interests granted by Buyer in this Agreement. Upon the occurrence and during the continuance of a Default (as defined in Section 3 below) hereunder, if Buyer fails to perform its obligations as required by this Agreement, Seller is authorized, in Buyer's name or otherwise, to take any such action, including, without limitation, signing Buyer's name or paying any amount required, and the cost shall be a liability secured under this Agreement and shall be payable by Buyer upon demand. Buyer grants Seller a contractual right, upon the occurrence and during the continuance of a Default, to set off any and all liabilities of Buyer secured hereunder, including without limitation, the PMSI Liabilities (collectively, the "Liabilities") against any credit balance of Buyer and against any other money now or hereafter owed to Buyer by Seller. Upon the occurrence and during the continuance of a Default, Buyer appoints Seller and any employee thereof, as Buyer's attorney, with full power to do all acts and things which Seller may deem necessary to perfect, continue perfected, enforce or collect upon the security interests granted herein and to protect the Collateral, including, without limitation, the right and power, upon the occurrence and during the continuance of a Default, to endorse Buyer's name on any notes, checks or other proceeds of Collateral that may come into Seller's possession and to execute proofs of claim and loss and adjust and compromise claims under insurance policies.

2. **BUYER'S WARRANTIES AND COVENANTS.** Buyer warrants that: (i) Buyer is the legal and beneficial owner of the Collateral secured hereunder free of all encumbrances and security interests except for the security interests granted in Section 1 above and except for the security interest(s) granted to Terex USA, LLC and Terex Global GMBH and the security interest granted to People's United Bank, National Association (or its successor or assignee); (ii) the execution and delivery of this Agreement and any instruments evidencing Liabilities to the Seller have been duly and properly authorized by all necessary action, and will not violate or constitute a breach of Buyer's Articles of Incorporation, Bylaws, other constituting documents, or any agreement or restriction to which Buyer is a part or is subject and this Agreement and all instruments evidencing Liabilities are valid and binding obligations of Buyer, enforceable in accordance with their terms; (iii) the name appearing below is the correct name of Buyer, and, except as may be noted below Buyer's signature, Buyer does not do business under any other name; (iv) Buyer is organized and in good standing in the jurisdiction appearing below Buyer's signature, and Buyer's organizational number (if applicable) is as set forth below Buyer's signature and without providing at least 30 days prior written notice to Seller, Buyer shall not change its name, identity, jurisdiction of organization or structure (corporate or otherwise); and (v) the address appearing below Buyer's signature is the chief executive office of Buyer's business, or, if Buyer has no place of business, its residence, and the address (or addresses) where the Collateral will be kept, if different from that appearing below Buyer's signature, is (or are) set forth at the end of this Agreement. Buyer shall: maintain the Collateral in good condition and repair and not permit its value to be impaired; keep it free from all liens, encumbrances and security interests except as otherwise provided herein; defend the Collateral against all claims and legal proceedings by any persons; keep the Collateral and Seller's interest in it insured under policies with such provisions, for such amounts, and by such insurers as shall be reasonably satisfactory to Seller from time to time, and shall obtain endorsements naming Seller as loss payee and furnish evidence of such insurance satisfactory to Seller; acquire all permits, licenses, and certificates of title required by law for it, its ownership, or its use or operation; pay and discharge when due all taxes, license fees, levies and other charges upon it, related to it, or related to its ownership, use of operation of the Collateral; not sell, lease or otherwise dispose of the Collateral or permit it to become a fixture or an accession to other goods, except for sales or leases of the Collateral in the ordinary course of Buyer's business; not permit

the Collateral to be used in violation of any applicable law, regulation or policy of insurance; not make or permit any material changes to the Collateral; not move the Collateral (other than Collateral that is rented to a customer) to a location other than one of those listed at the end of this Agreement without Seller's written consent. Buyer shall upon request, take any action reasonably deemed advisable by Seller to preserve the Collateral or to establish, determine priority of, perfect, continue perfected, terminate and/or enforce Seller's interest in it or rights under this Agreement. Buyer shall pay all expenses (including, without limitation, reasonable attorneys' fees) in connection with the enforcement of Seller's rights under this Agreement. Buyer shall not file any amendments, corrective statements or termination statements regarding the security interests granted herein without the prior written consent of Seller. Buyer shall immediately notify Seller of the occurrence of any Default hereunder.

3. DEFAULT.  Upon the occurrence of an event of Default (as hereinafter defined) then (i) all of the Liabilities shall, at the option of Seller and without notice or demand, become immediately due and payable; and Seller shall have all rights and remedies of a secured party under the Uniform Commercial Code, as well as by any other applicable law; (ii) Seller may enter into premises where any Collateral may be located, and may take possession of Collateral, all without notice or hearing.; (iii) Seller may require Buyer to assemble the Collateral and to make it available to Seller at any convenient place designated by Seller; (iv) Buyer shall reimburse Seller for any expense incurred by Seller in protecting or enforcing its rights under this Agreement including without limitation reasonable attorneys' fees and legal expenses and all expenses of taking possession, holding, preparing for disposition and disposing of the Collateral; and (v) Seller may permit Buyer to remedy any default, and Seller may waive any default without waiving any other subsequent or prior default by Buyer. A "Default" shall mean any one or more of the following: (a) Buyer fails to pay when due any of the Liabilities or to perform, or rectify the breach of, any warranty or other undertaking by Buyer in this Agreement, and fails to cure such failure within fifteen (15) days after receiving written notice thereof from Seller, including without limitation, if the Collateral suffers any loss, theft, substantial damage, or destruction unless covered by insurance, the proceeds of which are  paid to Seller within fifteen (15) days following receipt thereof by Buyer, or if there occurs a sale (other than a sale in the Buyer's ordinary course of business) or encumbrance (other than Seller's security interests or other security interests provided herein) of or to any of the Collateral, or if any levy, seizure or attachment is made of or on the Collateral, or if a default occurs under any agreement between Seller and Buyer (including, without limitation, any Distributorship and/or Selling Agreement) which is not cured within any applicable cure period; or (b) Buyer or a surety for any of the Liabilities dies, ceases to exist, becomes insolvent or the subject of bankruptcy or insolvency proceedings or enters into or becomes a party to any merger, consolidation, reorganization or exchange of stock or assets which results in a change of control of Buyer; or (c) any representation made by Buyer or any surety of any of the Liabilities to induce Seller to extend credit to Buyer, under this Agreement or otherwise, is false in any material respect when made; or (d) if Buyer shall file a termination statement with respect to any financing statement filed under the Uniform Commercial Code covering the Collateral in favor of Buyer, if at such time any Liabilities remain outstanding and unpaid.

4. MISCELLANEOUS.  THE VALIDITY, CONSTRUCTION AND ENFORCEMENT OF THIS AGREEMENT ARE DETERMINED AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK.  THE BUYER WAIVES ITS RIGHTS TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR THE RIGHTS, REMEDIES OR DUTIES HEREUNDER.   As part of the consideration for Seller's executing this Agreement, Buyer consents to the jurisdiction of any local, state or federal court located within the State of New Jersey,  and waives personal service of any and all process upon the Buyer herein, and consents that all such service of process may be made by certified or registered mail directed to the Buyer at the address designated below and service so made shall be deemed to be completed three (3) calendar days after the same shall have been posted as aforesaid.  Buyer waives any objection to venue of any action instituted hereunder.  All terms not otherwise defined have the meanings assigned to them by Articles I and IX of the Uniform Commercial Code.  Invalidity of any provision of this Agreement shall not affect the validity of any other provisions.  All headings and subheadings contained in this Agreement are to be used for convenience only and shall not be deemed to limit or diminish any of the provisions hereof.  Seller may assign this Agreement at any time without consent of or notice to Buyer.  Buyer shall not and cannot, unless otherwise consented to in writing by Seller, assign this Agreement, any interest herein or any interest in the Collateral (other than sales or leases of Collateral in the ordinary course of business) by its own act or by operation of law or otherwise, and any such attempted assignment shall be void.  In the event Seller assigns this Agreement, Buyer shall not be relieved of any obligation, undertaking, warranty or representation contained or made herein.  Seller's assignee shall have all the rights, powers, remedies and interests of Seller hereunder.  This Agreement when accepted by Seller shall constitute the entire agreement between the parties, and no agreements, promises or representations of any character, either written or oral, not set forth in this Agreement shall be binding on the parties hereto.  No modification or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose given.

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

Signed on this __*31*__ day of __*OcT*__, 20*18*

### BUYER: Hoffman International, Inc.

By:
Name: Timothy J. Wolters
Title: President
Address: 300 S. Randolphville Rd.
         Piscataway, New Jersey 08854

Jurisdiction of Organization: New Jersey
Organizational Number: 0100048603
Trade Names (if any): Hoffman Equipment

Other locations of Collateral:   Collateral to be held at the location above and other locations listed in the Distributorship Agreement dated the date hereof.

SELLER:  Terex USA, LLC
By:
Name:
Title: Todd Goss
       GM       10-31-18

SELLER:  Terex Global GMBH
By:
Name:
Title:

## SCHEDULE E

### TERMS & CONDITIONS OF SALE

**1. Terms and Conditions.** These Terms and Conditions of Sale cancel and supersede any and all terms of sale pertaining to Parts and Equipment (and any supplements thereto) previously issued by Seller to Buyer and are subject to change without advance notice. The prices, charges, discounts, terms of sale and other provisions referred to or contained herein shall apply to Products (Parts and Equipment) sold and shipped to Buyer on and after April 1, 2016, and shall remain in effect unless and until superseded in writing by Seller. Acceptance of an order for Equipment and/or Parts by Seller shall be deemed to constitute a binding agreement between the parties pursuant to the terms and conditions contained herein and Buyer agrees that the order may not thereafter be cancelled, countermanded or otherwise changed without the prior written consent of Seller. This agreement supersedes any prior agreements, representations, or other communications between the parties relating to the subject matter set forth herein. No other terms and conditions shall apply including the terms of any purchase order submitted to Seller by Buyer, whether or not such terms are inconsistent or conflict with or are in addition to the terms and conditions set forth herein. Seller's acceptance of Buyer's purchase order is conditional upon Buyer's acceptance of all the terms and conditions contained in this agreement. Any communication construed as an offer by Seller and acceptance thereof is expressly limited to the terms and conditions set forth herein. The Products are intended for industrial/commercial use by professional contractors and their trained employees and are not intended for use by consumers.

**2. Terms of Payments.** Payment for Parts and Equipment purchased by Buyer shall be made in accordance with any of the following terms, provided they have been previously arranged with and expressly approved by Seller in writing: (1) cash in advance; (2) confirmed, irrevocable letter of credit established in such amount and form and at such time and at such bank as shall be approved by Seller in respect of each order; (3) credit account purchases for which payment will be due and payable on net thirty (30) day terms, plus service and other charges applicable to past due amounts in accordance with Seller's written notices; or (4) other payment arrangements expressly approved by Seller in writing prior to or at the time the order is placed. If any Buyer credit account purchase is not paid in accordance with Seller's credit payment terms, in addition to any other remedies allowed in equity or by law, Seller may refuse to make further shipments without advance payment by Buyer. Nothing contained herein shall be construed as requiring Seller to sell any Parts or Equipment to Buyer on credit terms at any time, or prohibiting Seller from making any and all credit decisions which it, in its sole discretion, deems appropriate for Seller. Seller shall charge interest on all amounts not paid when due and Buyer agrees to pay such interest calculated on a daily basis, from the date that payment was due until the Seller receives payment in full, at the rate of 1.5% per month or the maximum rate permitted by applicable law. Unless otherwise agreed in writing between Seller and Buyer, Seller may, in its sole discretion, increase or decrease the price of any Parts or Equipment, as Seller deems reasonably necessary, at any time prior to shipment and invoice Buyer for the same. The purchase price of Parts and Equipment in effect at the time an order is placed may not be the same price in effect at the time of shipment. Buyer shall be invoiced for, and agrees to pay, the price in effect at the time of shipment.

**3. Taxes and Duties.** Unless otherwise specified, prices quoted do not include taxes or duties of any kind or nature. Buyer agrees that it will be responsible for filing all tax returns and paying applicable tax, duty, export preparation charge and export documentation charge resulting from the purchase of any Products. In addition, in the event any other similar tax is determined to apply to Buyer's purchase of any Products from Seller, Buyer agrees to indemnify and hold Seller harmless from and against any and all such other similar taxes, duties and fees. All prices quoted are U.S. DOLLARS unless otherwise specified. The amount of any present or future taxes applicable to the sale, transfer, lease or use of any Products shall be paid by Buyer; or in lieu thereof, Buyer shall provide Seller with a tax exemption certificate satisfactory to the applicable taxing authority proving that no such tax is due and payable upon such sale, transfer, lease or use.

**4. Titles, Transportation and Delivery.** Unless otherwise stated in writing, all prices and delivery are FCA, Seller's Premises (Incoterms 2010). Title and all risk of loss or damage to Products shall pass to Buyer upon delivery, as per Incoterms 2010. Any claims for loss, damage or delay in transit must be entered and prosecuted by the Buyer directly with the carrier, who is hereby declared to be the agent of the Buyer. Seller shall not be liable for any delay in performance of this sales order agreement or delivery of the Products, or for any damages suffered by Buyer by reason of delay, when the delay is caused, directly or indirectly, by fire, flood, accident, riot, acts of God, war, governmental

Distributorship Agreement, Terex Supplier, USA Distributor (Rev. 04 March 2016)                16
Confidential

interference, strikes, embargoes, labor difficulties, shortage of labor, fuel, power, materials or supplies, transportation, or any other causes beyond Seller's control. In the event delay is caused by Buyer's failure to furnish necessary information with respect to data and details for Buyer's specifications, Seller may extend the date of shipment for a reasonable time, but in no event longer than five (5) days. In the event delay in shipment is caused by Buyer or at Buyer's request, and the Products are not shipped within five (5) days from the first date they are ready to be shipped, Seller may, in its sole discretion, sell such Products to another buyer without any liability or responsibility to Buyer whatsoever. All payments shall be made in accordance with the terms of the applicable invoice. In addition, storage charges due to delay in furnishing delivery instructions, arranging and establishing a method of payment satisfactory to Seller, or submitting valid import permits or licenses, or any other delay caused by Buyer or at Buyer's request, will be for the account of Buyer. Any dates quoted for delivery are approximate only and the Seller shall not be liable for any delay in delivery. Claims for shortages in shipments shall be deemed waived and released by Buyer unless made in writing within five (5) days after Buyer's receipt of Products. Seller's responsibility for shipment shall cease upon delivery of the Products to the place of shipment, and all claims occurring thereafter shall be made to or against the carrier by Buyer.

5. **Cancellation.** Prior to delivery to place of shipment, an Equipment or Parts order may be cancelled only with Seller's prior written consent and upon terms indemnifying Seller from all resulting losses and damages. Seller shall have the right to cancel and refuse to complete an Equipment or Parts order if any term and/or condition governing this agreement is not complied with by Buyer. In the event of cancellation by Seller, or in the event Seller consents to a request by Buyer to stop work or to cancel the whole or any part of any order, Buyer shall make reimbursement to Seller, as follows: (i) any and all work that can be completed within (30) days from date of notification to stop work on account of cancellation shall be completed, shipped and paid in full; and (ii) for work in progress and any materials and supplies procured or for which definite commitments have been made by Seller in connection with the order, Buyer shall pay such sums as may be required to fully compensate Seller for actual costs incurred, plus fifteen percent (15%). Buyer may not cancel any order after Seller's delivery to place of shipment. Orders for "Special" Equipment may not be cancelled after acceptance, except by Seller. Items of "Special" Equipment are those that differ from standard Seller specifications, have a limited market, or incorporate specifications that have been determined for a specific application. Determination of whether an item of Equipment is "Special" shall be made by Seller in its sole discretion.

6. **Inspection and Acceptance of Equipment.** Buyer agrees that it shall inspect the Equipment immediately after receipt and promptly (in no event later than fifteen (15) days after receipt) notify Seller in writing of any non-conformity or defect. Buyer further agrees that failure to give such prompt notice or the commercial use of the Equipment shall constitute acceptance. Acceptance shall be final and Buyer waives the right to revoke acceptance for any reason, whether or not known by Buyer at the time of such acceptance. The giving of any such notice by Buyer shall automatically cause the provisions of Seller's warranty to apply and govern the rights, obligations and liabilities of the parties with respect to such nonconformity or defect, provided under no circumstances shall rejection give rise to any liability of Seller for incidental or consequential damages or losses of any kind.

7. **Warranty.** Seller warrants its new Equipment manufactured and sold worldwide, to be free, under normal use and service, of any defects in material or workmanship for a period of 12 months from the date the Equipment is first placed into service, whether such Equipment is sold, rented or leased. In no event shall this warranty extend beyond a period of 18 months from the date of shipment from the factory. Seller warrants its OEM replacement Parts ordered from its Parts Department to be free of defects in manufacture or materials for a period of: (i) twelve (12) months from the date of shipment from the factory, (ii) or the period remaining on the Equipment warranty for the affected Equipment (if any), whichever is shortest. This warranty shall only be valid if Buyer sends Seller written notice of the defect within thirty (30) days of its discovery and establishes that: (i) the Products have been maintained and operated within the limits of rated and normal usage; and (ii) the defect did not result in any manner from the intentional or negligent action or inaction by Buyer, its agents or employees. If requested by Seller, Buyer must return the defective Product to Seller's manufacturing facility for inspection, and if Buyer cannot establish that conditions (i) and (ii) above have been met, then this warranty shall not cover the alleged defect. Failure to give written notice of defect within such period shall be a waiver of this warranty and any assistance rendered thereafter shall not extend or revive it. Accessories, assemblies and components included in equipment of Seller, which are not manufactured by Seller, are subject to the warranty of their respective manufacturers. This warranty shall not cover any item on which serial numbers have been altered, defaced or removed. Maintenance and wear parts are not covered by this warranty and are the sole maintenance responsibility of Buyer. This warranty is limited to the first user and is not assignable or otherwise transferable without written agreement of the manufacturer. **THIS WARRANTY IS EXPRESSLY IN LIEU OF**

AND EXCLUDES ALL OTHER WARRANTIES, EXPRESS OR IMPLIED (INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE) AND ALL OTHER OBLIGATIONS OR LIABILITY ON SELLER'S PART. THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE LIMITED WARRANTY CONTAINED HEREIN. Seller neither assumes nor authorizes any other person to assume for Seller any other liability in connection with the sale of Seller's Products. This warranty shall not apply to any of Seller's Products or any part thereof which has been subject to misuse, alteration, abuse, negligence, accident, acts of God or sabotage. No action by either party shall operate to extend or revive this limited warranty without the prior written consent of Seller.

**8. Remedies for Breach.** IN THE EVENT OF ANY BREACH OF THE WARRANTY BY SELLER, THE PARTIES AGREE THAT SELLER'S LIABILITY SHALL BE LIMITED EXCLUSIVELY TO THE REMEDIES OF REPAIR OR REPLACEMENT (AT SELLER'S SOLE DISCRETION) OF ANY DEFECTIVE EQUIPMENT COVERED BY THE WARRANTY.

**9. LIMITATION OF LIABILITY. NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, Seller and its affiliates shall not be liable for, and specifically disclaim, any liability for any: (A) LOST PROFITS and/or business interruption (WHETHER DIRECT OR INDIRECT); and (B) indirect, incidental, consequential (whether direct or indirect) or other damages or losses of any kind,** including without limitation, labor costs, loss of use, equipment rental, third party repairs, investigation costs, personal injury, emotional or mental distress,  penalties, loss of service of personnel, or failure of Products to comply with any applicable laws; whether or not arising from breach of contract, warranty, negligence, product liability or otherwise.

**10. Limitation of Actions**. Any action for breach of this agreement must be commenced within one (1) year after the cause of action has accrued.

**11. Specification Changes**. In the event Seller incurs additional expense because of changes in specifications or drawings previously approved by Buyer, or in the event Seller is required to modify the ordered Equipment, perform any additional work or supply any additional Equipment or Parts, the additional expense shall be added to the purchase price. Seller shall have the right, in its sole discretion, to accept or reject any changes in specifications requested by Buyer.  In no event shall any changes in specifications be made or accepted thirty (30) days prior to launch date or thereafter.

**12. Security Interest.** Buyer grants Seller a security interest in the Products purchased and the proceeds thereof. The security interest shall continue until payment in full of the purchase price and payment and performance by Buyer of all of its other obligations hereunder. Seller is entitled to all remedies of a secured party after default under the Oklahoma Uniform Commercial Code or other applicable law, including but not limited to the applicable Personal Property Security Act in Canada, in addition to all other rights provided by contract and by operation of law. Buyer agrees to pay to Seller, in addition to the interest on overdue sums due, reasonable attorney fees, court costs and other expenses of Seller incurred in enforcing Seller's rights. The Products purchased shall remain personal property and shall not become or be deemed a fixture or a part of any real estate on which it may be located. Buyer agrees to execute any instrument or document considered necessary by Seller to perfect its security interest in the Products including, but not limited to, financing statements, chattel mortgages, deeds of trust, deeds to secure debt, mortgages or other security instruments.

**13. Insurance**. Until the purchase price of any Product is paid in full, the Buyer shall provide and maintain insurance equal to the total value of any such Product delivered hereunder against customary casualties and risks; including, but not limited to fire and explosion, and shall also insure against liability for accidents and injuries to the public or to employees, in the names of Seller and Buyer as their interest may appear, and in an amount satisfactory to Seller. If the Buyer fails to provide such insurance, it then becomes the Buyer's responsibility to notify the Seller so that the Seller may provide same; and the cost thereof shall be added to the contract price. All loss resulting from the failure to affect such insurance shall be assumed by the Buyer.

**14. Patents, Copyrights, Trademarks, Confidentiality**. No license or other rights under any patents, copyrights or trademarks owned or controlled by Seller or under which Seller is licensed are granted to Buyer or implied by the sale of Equipment or Parts hereunder. Buyer shall not identify as genuine products of Seller Products purchased hereunder which Buyer has treated, modified or altered in any way, nor shall Buyer use Seller's trademarks to identify such products; provided, however, that Buyer may identify such products as utilizing, containing or having been manufactured from genuine products of Seller as treated, modified or altered by Buyer or Buyer's representative, upon written prior approval of Seller.  All plans, photographs, designs, drawings, blueprints, manuals, specifications and other documents relating to the business of Seller ("Information") shall be and remain the exclusive property of Seller

and shall be treated by Buyer as confidential information and not disclosed, given, loaned, exhibited, sold or transferred to any third party without Seller's prior written approval; provided, however, that these restrictions shall not apply to information that Buyer can demonstrate: (a) at the time of disclosure, is generally known to the public other than as a result of a breach of this Agreement by Buyer; or (b) is already in Buyer's possession at the time of disclosure by from a third party having a right to impart such information.

**15. Default and Seller's Remedies.** In the event of default by Buyer, all unpaid sums and installments owed to Seller, shall, at the Seller's sole option, become immediately due and payable without notice of any kind to Buyer. In addition to its right of acceleration, Seller may pursue any and all remedies allowed by law or in equity, including but not limited to any and all remedies available to it under the Oklahoma Uniform Commercial Code. In addition to the foregoing, and not in limitation thereof, Seller shall have the right to set off any credits or amounts owed to Buyer against any amounts owed by Buyer to Seller.

**16. Indemnification by Buyer.** Buyer hereby agrees to indemnify, release, defend and hold harmless Seller, its affiliates, directors, officers, employees, agents, representatives, successors, and assigns against any and all suits, actions or proceedings at law or in equity (including the costs, expenses and reasonable attorney's fees incurred in connection with the defense of any such matter) and from any and all claims demands, losses, judgments, damages, costs, expenses or liabilities, to any person whatsoever (including Buyer's and Seller's employees or any third party), or damage to any property (including Buyer's property) caused or contributed to by any act, omission, negligence or willful misconduct of Buyer, its directors, officers, employees, agents, representatives, successors or assigns, except to the extent that any act, omission, negligence or willful misconduct of Seller, its directors, officers, employees, agents, representatives, successors or assigns caused or contributed thereto. If Buyer fails to fulfill any of its obligations under this paragraph or this agreement, Buyer agrees to pay Seller all costs, expenses and attorney's fees incurred by Seller to establish or enforce Seller's rights under this paragraph or this agreement. The provisions of this paragraph are in addition to any other rights or obligations set forth in this agreement.

**17. Installation.** Unless otherwise expressly agreed in writing, Buyer shall be solely responsible for the installation and erection of the Products purchased. Although Seller may in some cases provide a serviceman, data and drawings to aid Buyer with installation or start-up, Seller assumes no responsibility for proper installation or support of any Product when installed and disclaims any express or implied warranties with respect to such installation and support. Notwithstanding whether data and drawings are provided or a serviceman aids in the installation, Buyer shall indemnify and hold Seller harmless and at Seller's request, defend Seller from all claims, demands or legal proceedings (including the costs, expenses and reasonable attorney's fees incurred in connection with the defense of any such matter) which may be made or brought against Seller in connection with damage or personal injury arising out of said installation or start-up.

**18. Force Majeure.** The Seller shall not be liable to the Buyer or be deemed to be in breach of this agreement by reason of any delay in performing, or any failure to perform, any of the Seller's obligations in relation to the Products if the delay or failure was due to any cause beyond the reasonable control of the Seller including (without limitation) strike, lockout, riot, civil commotion, fire, accident, explosion, tempest, act of God, war, epidemic, stoppage of transport, terrorist activity, supply shortage or changes in government, governmental agency, laws, regulations or administrative practices.

**19. Anti-Corruption; Export Controls; No Boycotts.** Buyer agrees that it shall, and that any party retained or paid by the Buyer ("Retained Party") shall, comply with all applicable laws including, but not limited to, laws prohibiting public corruption and commercial bribery. Buyer further agrees that it shall, and that any Retained Party shall, comply with all applicable export controls, economic sanctions, embargoes and regulations regarding the export, re-export, shipment, distribution and/or sale of Products, technology, information or warranty related services. Buyer further agrees that it shall comply, and any Retained Party wherever located shall comply with applicable laws pursuant to the Joint Comprehensive Plan of Action (JCPOA) of July 14, 2015 and any other applicable laws, resolutions, regulations or licenses for the export or re-export of Products, technology, information or warranty related services directly, or with its knowledge indirectly into Iran. Buyer further agrees that it shall not, and any Retained Party shall not, export or re-export Products, technology, information or warranty related services directly, or with its knowledge, indirectly, into Sudan. Buyer further agrees that it shall not, and any Retained Party shall not, export or re-export Products, technology, information or warranty related services directly or with its knowledge indirectly into Cuba without Buyer first obtaining written approval from Seller. Failure to comply strictly with this section and all applicable laws, regulations and licensing/approval requirements shall be grounds for immediate termination of this agreement by

Seller. Notwithstanding anything to the contrary contained in any agreement between the Buyer and Seller or in any other document or agreement relating to the Products sold hereunder, Seller will not comply with requests related to the boycott of any country or other jurisdiction, except to the extent such boycott is required by or otherwise not inconsistent with United States law.

**20. Construction and Severability.** This terms of sale agreement constitutes the entire agreement between the parties regarding the subject matter hereto and shall be construed and enforced in accordance with the laws of the State of New York. Seller shall not be bound by any agent's, employees or any other representation, promise or inducement not set forth herein. The invalidity or unenforceability of any provisions of this agreement shall not affect any other provision and this agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**21. Jurisdiction.** The parties agree that the proper and exclusive forum and venue in all legal actions brought to enforce or construe any of the provisions of this sales order agreement shall be in the United States District Court, Southern District of New York  or, if federal jurisdiction is lacking in such legal action, in the Supreme Court of Suffolk County, New York, U.S.A. and waive any and all objections to the jurisdiction or venue of said Court.

**22. No Assignment.** No rights arising under this agreement may be assigned by the Buyer unless expressly agreed to in writing by the Seller.

**23. Telematics.** If a telematics system is included with the Equipment, the telematics system is administered by a third party and collects a range of operational data about the Equipment including, but not limited to, usage, performance and reliability. Buyer consents to Seller's obtaining such data for warranty, product improvement and customer support purposes.

**24. Miscellaneous.** Buyer represents that: (i) it is solvent and has the financial ability to pay for the Equipment and Parts purchased hereunder and (ii) it has all requisite right, power and authority to perform its obligations under this agreement.

Buyer's Initials



**LIMITED PRODUCT WARRANTY**

## SCHEDULE F

Terex Deutschland GmbH and Terex USA, LLC  (hereafter referred collectively as "Seller") warrants its new Equipment, to be free of defects in material or workmanship for a period of 12 months from the date the Equipment is first placed into service, whether such Equipment is sold, rented, leased or used for demonstration, provided that in no event shall this warranty extend beyond a period of 18 months from the date of shipment from the factory; provided that (1) the Buyer or the end-user sends Seller written notice of the defect within  sixty (60) days of its discovery and establishes to the Seller's satisfaction that: (i) the Equipment has been maintained and operated within the limits of rated and normal usage, and that there have been no  alterations to it; and (ii) the defect did not result in any manner from the intentional or negligent action or inaction by Buyer or the end-user or any of their respective agents or employees or any person using it and (2) a new machine registration certificate or the commissioning documents have been completed, signed and delivered to Seller within thirty (30) days of the equipment's "in-service" date. If requested by Seller, Buyer must return the defective equipment to Seller's manufacturing facility, or other location designated by Seller, for inspection, and if Buyer cannot establish that conditions (1) (i) and (1) (ii) above have been met, then this warranty shall not cover the alleged defect.

Seller's obligation and liability under this warranty is expressly limited to, at Seller's sole option, repairing or replacing, with new or remanufactured parts or components, any part, which appears to Seller upon inspection to have been defective in material or workmanship.  Such parts shall be provided at no cost to the owner.  If requested by Seller, components or parts for which a warranty claim is made shall be returned to Seller at a location designated by Seller. All components and parts replaced under this limited product warranty become the property of Seller.

This warranty shall be null and void if parts (including wear parts) other than genuine OEM Seller parts are used in the equipment.

Accessories, assemblies and components included in the Seller equipment, which are not manufactured by Seller, are subject to the warranty of their respective manufacturers. Normal maintenance, adjustments, or maintenance/wear parts, including without limitation, friction plates, glass, clutch, proper tightening of bolts, nuts and brake linings pipe fittings, adding or replacing of fluids, filters, wire rope, belts and paint, are not covered by this warranty and are the sole maintenance responsibility of Buyer.

Seller makes no other warranty, express or implied, and makes no warranty of merchantability or fitness for any particular purpose.

No employee or representative is authorized to modify this warranty unless such modification is made in writing and signed by an authorized officer of Seller.

Seller's obligation under this warranty shall not include duty, taxes, environmental fees, including without limitation, disposal or handling of tires, batteries, petrochemical items, or any other charges whatsoever, or any liability for direct, indirect, incidental, or consequential damages.

Improper maintenance, improper use, abuse, improper storage, operation beyond rated capacity, operation after discovery of defective or worn parts, accident, sabotage or alteration or repair of the equipment by persons not authorized by Seller shall render this warranty null and void.  Seller reserves the right to inspect the installation of the product and review maintenance procedures to determine if the failure was due to improper maintenance, improper use, abuse, improper storage, operation beyond rated capacity, operation after discovery of defective or worn parts, or alteration or repair of the equipment by persons not authorized by Seller.

**Parts Warranty:** Seller warrants the parts ordered from the Seller's parts department to be free of defect in material or workmanship for either (1) a period of 12 months after date of shipment from the factory (2)) the balance of the remaining new equipment warranty, whichever occurs first.   With respect to parts ordered from the Seller's parts department for Equipment that is no longer covered under this limited product warranty due to lapse of time, Seller warrants such parts to be free of defect in material or workmanship for a period of either 12 months after date of shipment from the factory.

**Telematics.** If a telematics system is included with the Equipment, the telematics system is administered by a third party ("Teleservices Provider) and collects a range of operational data about the Equipment including, but not limited to, usage, performance and reliability. Buyer consents to Seller's obtaining such data from the Teleservices Provider for warranty, product improvement and customer support purposes. Buyer understands that the Equipment warranty is conditioned on the proper operation of the telematics system and Buyer shall not disable, tamper or interfere with the telematics system.

NO TRANSFERABILITY OF WARRANTY:  This warranty is limited to the original purchaser or original end-user if sold to a distributor, and is not assignable or otherwise transferable without the written agreement of Seller. Please contact your local distributor for additional details if needed.

### ITEMS NOT COVERED BY SELLER WARRANTY

The following items are NOT covered under the Seller Warranty (the following list is not exhaustive):

1. Items sold by any individual, corporation, partnership or any other organization or legal entity that is not an authorized Seller distributor.

2. Replacement of assemblies:  Seller has the option to repair or replace any defective part or assembly.  It is Seller's policy to refuse claims for the replacement of a complete assembly that is field repairable by the replacement or repair of defective part(s) within the assembly.

3. Normal Operational Maintenance Services and Wear Parts:  Maintenance services and wear parts are excluded from warranty claims.  Maintenance services and wear parts <u>not covered</u> include, but are not limited to, such items as: seals, gaskets, hoses, friction plates, glass, clutch and brake linings, filters, wire rope, exterior coatings, proper tightening of bolts, nuts and pipe fittings, adding or replacing of fluids, filters, belts, and paint, services supplies such as hand cleaners, towels and lubricants, and inspections, diagnostic time and travel time.

4. Transportation cost and/ or damage:  Any damage caused by carrier handling is a transportation claim and should be filed immediately with the respective carrier.

5. Deterioration:  Repairs, work required or parts exposed as the result of age, storage, weathering, lack of use, demonstration use, or use for transportation of corrosive chemicals.

6. Secondary Failures:  Should the owner or operator continue to operate a machine after it has been noted that a failure has occurred, Seller will not be responsible under the warranty for resultant damage to other parts due to that continued operation.

7. Workmanship of Others:  Seller does not accept responsibility for improper installation or labor costs or costs of any kind from personnel other than authorized Seller distributor personnel.

8. Stop and Go Warranty:  Seller does not recognize "Stop and Go" warranties.

9. INCIDENTAL OR CONSEQUENTIAL DAMAGE:  SELLER SHALL NOT  BE  LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF PRODUCTION, INCREASED OVERHEAD, LOSS OF BUSINESS OPPORTUNITY, DELAYS IN PRODUCTION, COSTS OF REPLACEMENT COMPONENTS AND INCREASED COSTS OF OPERATION THAT MAY ARISE FROM THE BREACH OF THIS WARRANTY. CUSTOMER'S SOLE REMEDY SHALL BE LIMITED TO (AT SELLER'S SOLE OPTION) REPAIR OR REPLACEMENT OF THE DEFECTIVE PART.

THIS WARRANTY IS EXPRESSLY IN LIEU OF AND EXCLUDES ALL OTHER WARRANTIES, REPRESENTATIONS AND CONDITIONS, EXPRESS OR IMPLIED AND ALL OTHER STATUTORY, CONTRACTUAL, TORTIOUS AND COMMON LAW OBLIGATIONS OR LIABILITY ON SELLER'S PART ARE HEREBY EXPRESSLY EXCLUDED TO THE MAXIMUM EXTENT PERMITTED BY LAW.  THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE LIMITED WARRANTY CONTAINED HEREIN. Seller neither assumes nor authorizes any other person to assume for Seller any other liability in connection with the sale of Seller's equipment. This warranty shall not apply to any of Seller's equipment or any part thereof which has been subject to misuse, alteration, abuse, negligence, accident, acts of God or sabotage. No action by any party shall operate to extend or revive this limited warranty without the prior written consent of Seller.  In the event that any provision of this warranty is held unenforceable for any reason, the remaining provisions shall remain in full force and effect.

Distributorship Agreement, Terex Supplier, USA Distributor (Rev. 04 March 2016)
Confidential



### LIMITED PRODUCT WARRANTY

IN THE EVENT OF ANY BREACH OF THE WARRANTY BY SELLER, SELLER'S LIABILITY SHALL BE LIMITED EXCLUSIVELY TO THE REMEDIES (AT SELLER'S SOLE OPTION) OF REPAIR OR REPLACEMENT OF ANY DEFECTIVE EQUIPMENT COVERED BY THE WARRANTY. IN NO EVENT SHALL SELLER, OR ANY SUBSIDIARY OR DIVISION THEREOF BE LIABLE FOR ANY: (A) LOST PROFITS AND/OR BUSINESS INTERRUPTION (WHETHER DIRECT OR INDIRECT); AND (B) INDIRECT, INCIDENTAL, CONSEQUENTIAL (WHETHER DIRECT OR INDIRECT) OR OTHER DAMAGES OR LOSSES OF ANY KIND, RESULTING FROM ANY BREACH OF WARRANTY, REPRESENTATION OR CONDITION, EXPRESS OR IMPLIED, OR ANY OTHER TERMS OF THIS WARRANTY, OR ANY BREACH OF ANY DUTY OR OBLIGATION IMPOSED BY STATUTE, CONTRACT, TORT OR COMMON LAW OR OTHERWISE (WHETHER OR NOT CAUSED BY THE NEGLIGENCE OF THE SELLER, ITS EMPLOYEES, AGENTS OR OTHERWISE), INCLUDING, WITHOUT LIMITATION, LOSS OF USE, LOST PROFITS OR REVENUES, LABOUR OR EMPLOYMENT COSTS, LOSS OF USE OF OTHER EQUIPMENT, DOWNTIME OR HIRE CHARGES, THIRD PARTY REPAIRS, IMPROPER PERFORMANCE OR WORK, LOSS OF SERVICE OF PERSONNEL, LOSS OF CONTRACT OR OPPORTUNITY AND PENALTIES OF ANY KIND, OR FAILURE OF EQUIPMENT TO COMPLY WITH ANY APPLICABLE LAWS.  THE SELLER'S LIABILITY TO THE BUYER SHALL NOT IN ANY EVENT EXCEED THE PURCHASE PRICE OF THE EQUIPMENT.

# EXHIBIT 2

| Branch | Invoice # | Customer Number | Account # | Billing Date cc/yy/mm/dd | | Orig Amt |
|--------|-----------|-----------------|-----------|--------------------------|---|----------|
| 01 | Z00742 | ABSCO001 | 11000 | 11/18/2019 | $ | 9,365.87 |
| 01 | Z00109 | ALLIE030 | 11000 | 1/28/2019 | $ | 970.29 |
| 01 | Z00709 | ALLIE030 | 11000 | 12/31/2019 | $ | 5,854.44 |
| 01 | Z01073 | CKSCR001 | 11000 | 12/31/2019 | $ | 5,475.09 |
| 01 | Z01324 | DONJO001 | 11000 | 5/12/2020 | $ | 2,989.65 |
| 07 | Z01338 | JJREC002 | 11000 | 5/29/2020 | $ | 114.65 |
| 01 | Z00954 | SIMSM001 | 11000 | 12/11/2019 | $ | 29,760.34 |
| 01 | N05575 | SIMSM001 | 11000 | 1/16/2020 | $ | 2,865.25 |
| 01 | Z01011 | SIMSM001 | 11000 | 1/27/2020 | $ | 11,093.42 |
| 01 | N05607 | SIMSM001 | 11000 | 2/11/2020 | $ | 5,390.96 |
| 01 | Z01040 | SIMSM001 | 11000 | 2/24/2020 | $ | 9,270.92 |
| 01 | Z01166 | SIMSM001 | 11000 | 3/11/2020 | $ | 3,307.97 |
| 01 | N05617 | SIMSM001 | 11000 | 3/18/2020 | $ | 26,241.79 |
| 01 | Z01178 | SIMSM001 | 11000 | 3/20/2020 | $ | 13,000.00 |
| 01 | Z01195 | SIMSM001 | 11000 | 4/7/2020 | $ | 19,596.52 |
| 01 | Z01179 | SIMSM001 | 11000 | 4/9/2020 | $ | 79,203.00 |
| 01 | Z01278 | SIMSM001 | 11000 | 4/13/2020 | $ | 13,000.00 |
| 01 | N06094 | SIMSM001 | 11000 | 5/7/2020 | $ | 5,735.60 |
| 01 | Z01329 | SIMSM001 | 11000 | 5/12/2020 | $ | 511.88 |
| 01 | Z01290 | SIMSM001 | 11000 | 5/14/2020 | $ | 8,703.72 |
| 01 | Z01328 | SIMSM001 | 11000 | 5/21/2020 | $ | 6,690.93 |
| 07 | Z01233 | SIMSM001 | 11000 | 5/31/2020 | $ | 63,699.66 |
| 07 | Z01282 | SIMSM001 | 11000 | 5/31/2020 | $ | 13,000.00 |
| 07 | Z01286 | SIMSM001 | 11000 | 5/31/2020 | $ | 2,191.40 |
| 01 | Z00559 | TNTSC001 | 11000 | 6/11/2019 | $ | 2,434.47 |
| 01 | Z00704 | TNTSC001 | 11000 | 8/20/2019 | $ | 19,113.04 |
| 06 | A02822 | UNITE072 | 11000 | 3/30/2020 | $ | 4,104.26 |
| | | | | | **$** | **363,685.12** |

| Outstd Amt | Flatrate Make |
|---:|---|
| $ 9,365.87 | FU |
| $ 970.29 | FU |
| $ 5,854.44 | FU |
| $ 5,475.09 | FU |
| $ 2,989.65 | FU |
| $ 114.65 | FU |
| $ 29,760.34 | FU |
| $ 2,865.25 | FU |
| $ 11,093.42 | FU |
| $ 5,390.96 | FU |
| $ 9,270.92 | FU |
| $ 3,307.97 | FU |
| $ 26,241.79 | FU |
| $ 13,000.00 | FU |
| $ 19,596.52 | FU |
| $ 79,203.00 | FU |
| $ 13,000.00 | FU |
| $ 5,735.60 | FU |
| $ 511.88 | FU |
| $ 8,703.72 | FU |
| $ 6,690.93 | FU |
| $ 63,699.66 | FU |
| $ 13,000.00 | FU |
| $ 2,191.40 | FU |
| $ 198.45 | FU |
| $ 13,966.79 | FU |
| $ 4,104.26 | FU |

# EXHIBIT 3

| Vendor/ Customer | Name | Description | Invoice | Invoice Date | Invoiced Amount | Under/Over | Collected | Open AR | |
|---|---|---|---|---|---|---|---|---|---|
| WARRA093 | WARRANTY - FUCHS | Throttle issues | R08857 | 11/29/2018 | 2,104.58 | 2,104.58 | - | | |
| WARRA093 | WARRANTY - FUCHS | NO HEAT | Z00281 | 2/7/2019 | 1,218.63 | 1,218.63 | - | | |
| WARRA093 | WARRANTY - FUCHS | No Heat | R09387 | 2/13/2019 | 2,078.24 | 2,078.24 | - | | |
| WARRA093 | WARRANTY - FUCHS | REGEN ISSUE | Z00296 | 2/26/2019 | 654.11 | 654.11 | - | | |
| WARRA093 | WARRANTY - FUCHS | No heat in cab | Z00082 | 3/1/2019 | 3,359.63 | 3,359.63 | - | | |
| WARRA093 | WARRANTY - FUCHS | Regen Symbol | R10126 | 5/8/2019 | 2,325.00 | 2,325.00 | - | | |
| WARRA093 | WARRANTY - FUCHS | CHECK ENGINE LIGHT | Z00550 | 5/22/2019 | 793.05 | 793.05 | - | | |
| WARRA093 | WARRANTY - FUCHS | LOW POWER | N04759 | 5/28/2019 | 5,052.80 | 5,052.80 | - | | |
| WARRA093 | WARRANTY - FUCHS | CRACKED BOOM | N04942 | 6/5/2019 | 10,056.54 | 10,056.54 | - | | |
| WARRA093 | WARRANTY - FUCHS | WELD CRACKED BOOM | Z01050 | 12/27/2019 | 23,677.74 | 9,971.30 | - | 13,706.44 | In AR |
| WARRA093 | WARRANTY - FUCHS | NO HYDRAULIC FUNCTIO | Z01038 | 1/3/2020 | 9,310.99 | 2,922.90 | - | 6,388.09 | In AR |
| WARRA093 | WARRANTY - FUCHS | REGEN ISSUES | A02531 | 1/20/2020 | 2,652.39 | 2,138.64 | - | 513.75 | In AR |
| WARRA093 | WARRANTY - FUCHS | CRACKED BOOM | N04867 | 1/23/2020 | 87,024.68 | 48,865.70 | - | 38,158.98 | In AR |
| WARRA093 | WARRANTY - FUCHS | PRODUCT NOTICE 01/18 | Z01114 | 1/30/2020 | 712.50 | 120.00 | - | 592.50 | In AR |
| WARRA093 | WARRANTY - FUCHS | regen isssues | Z01069 | 2/21/2020 | 2,759.53 | 2,121.38 | - | 638.15 | In AR |
| WARRA093 | WARRANTY - FUCHS | check engine light | Z01092 | 2/27/2020 | 2,415.09 | 1,107.09 | - | 1,308.00 | In AR |
| WARRA093 | WARRANTY - FUCHS | CRACKED BOOM | Z01226 | 3/17/2020 | 62,268.53 | - | - | 62,268.53 | In AR |
| WARRA093 | WARRANTY - FUCHS | BROKEN BOOM | Z01043 | 3/17/2020 | 59,646.92 | 36,187.32 | - | 23,459.60 | In AR |
| WARRA093 | WARRANTY - FUCHS | ADD MORE SHIMS TO BO | Z01247 | 4/30/2020 | 1,200.00 | - | - | 1,200.00 | In AR |
| WARR012 | WARRANTY - FUCHS | WARRANTY | A02997 | 5/7/2020 | 27,948.54 | - | | 27,948.54 | |
| WARRA093 | WARRANTY - FUCHS | Light/error code | Z00306 | 3/25/2019 | 862.50 | 142.50 | 720.00 | | |
| WARRA093 | WARRANTY - FUCHS | CHECK ENGINE | Z00821 | 10/29/2019 | 2,236.24 | 310.20 | 1,926.04 | | |
| WARRA093 | WARRANTY - FUCHS | check door | G01707 | 11/13/2019 | 4,767.89 | 410.61 | 4,357.28 | | |
| WARRA093 | WARRANTY - FUCHS | LOW POWER | Z00696 | 7/12/2019 | 2,715.11 | 1,096.72 | 1,618.39 | | |
| WARRA093 | WARRANTY - FUCHS | AC INOP & CAB RISER | N05275 | 9/5/2019 | 2,625.84 | 1,105.15 | 1,520.69 | | |
| WARRA093 | WARRANTY - FUCHS | CLIMATE CONTROL UPDA | Z00006 | 11/29/2018 | 2,372.16 | 1,215.53 | 1,156.63 | | |
| WARRA093 | WARRANTY - FUCHS | check engine light | Z00186 | 2/7/2019 | 5,606.32 | 1,998.80 | 3,607.52 | | |
| WARRA093 | WARRANTY - FUCHS | TEMPERATURE ISSUES | Z00819 | 9/5/2019 | 3,453.34 | 2,153.41 | 1,299.93 | | |
| WARRA093 | WARRANTY - FUCHS | errror code tamper | Z00801 | 10/9/2019 | 17,965.43 | 3,003.24 | 14,962.19 | | |
| WARRA093 | WARRANTY - FUCHS | REGEN ISSUE | Z00628 | 11/27/2019 | 6,061.10 | 3,007.50 | 3,053.60 | | |
| WARRA093 | WARRANTY - FUCHS | CHECK REGEN ISSUE | Z00379 | 3/27/2019 | 9,311.25 | 3,091.73 | 6,219.52 | | |
| WARRA093 | WARRANTY - FUCHS | low power | Z00867 | 9/24/2019 | 10,488.33 | 3,093.73 | 7,394.60 | | |
| WARRA093 | WARRANTY - FUCHS | REGEN ISSUES | A01729 | 8/14/2019 | 5,721.58 | 3,339.17 | 2,382.41 | | |
| WARRA093 | WARRANTY - FUCHS | BOOM WELD REPAIR | N04911 | 6/6/2019 | 14,115.25 | 3,721.25 | 10,394.00 | | |
| WARRA093 | WARRANTY - FUCHS | SWING ISSUE | N04650 | 6/24/2019 | 16,400.81 | 6,636.80 | 9,764.01 | | |
| WARRA093 | WARRANTY - FUCHS | INSPECT ENGINE | N04674 | 6/26/2019 | 45,480.09 | 11,781.09 | 33,699.00 | | |
| WARRA093 | WARRANTY - FUCHS | BROKEN BOOM | N04700 | 6/7/2019 | 93,248.16 | 22,135.71 | 71,112.45 | | |
| | | | | | **550,690.89** | **199,320.05** | **175,189.26** | **176,182.58** | |

# EXHIBIT 4

| | | Unit Number | Serial Number | Original Invoice | | Discount invoice | | Difference | | Percentage Change |
|---|---|---|---|---|---|---|---|---|---|---|
| Fuchs | MHL360F2 | H03483 | 360410-5527 | $ | 479,754.00 | $ | 442,000.00 | $ | 37,754.00 | 7.87% |
| Fuchs | MHL340F2 | H03479 | 340410/5409 | $ | 285,551.00 | $ | 262,706.92 | $ | 22,844.08 | 8.00% |
| Fuchs | MHL340F2 | H03480 | 340410/5421 | $ | 285,551.00 | $ | 262,706.92 | $ | 22,844.08 | 8.00% |
| Fuchs | MHL350F2 | H03481 | 350-5408 | $ | 389,696.00 | $ | 358,520.32 | $ | 31,175.68 | 8.00% |
| Fuchs | MHL350F2 | H03482 | 350410-5519 | $ | 389,196.00 | $ | 358,060.32 | $ | 31,135.68 | 8.00% |
| | | | | | | | | **$ 145,753.52** | | |